

**FILED**
11/25/2015
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DEFENDANTS COURT
FOR THE NORTHERN DEFENDANTS OF ILLINOIS

VANESSA SMITH, and
G.C., a minor by and through
biological parent, VANESSA SMITH,

                       Plaintiffs,

v.

~~WILLIAM~~ JAMES MEEKS, President, Illinois State Board of Education,
DR. NAKIA HALL, President, Board of Education of Crete
Monee Community Unit School Defendants No. 201U, in her
Individual and official capacity, NATHANIEL
CUNNINGHAM, Superintendent, Crete Monee
Community Unit School Defendants 201U, in his individual and
Official capacity, ELLEN BELOTTI, Director of
Special Education, Crete Monee Community
Unit School Defendants 201U, in her individual and official
capacity, KOKONA CHRISOS, Principal, Crete Monee
Middle School, in her individual and official capacity,
DINA LEFTAKIS, School Psychologist, Crete Monee
Middle School, in her individual and official capacity,
KEVIN VAN COTT, Behavior Specialist, Crete
Monee Middle School, in his individual and official capacity,
KATHRYN BOLSTER, Case Manager, Crete Monee
Middle School, in her individual and official capacity,

                       Defendants.

15CV10250
JUDGE ALONSO
MAG. JUDGE ROWLAND

_____

**RECEIVED**

NOV 12 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

### VERIFIED COMPLAINT

### PRELIMINARY STATEMENT

      NOW COMES, Vanessa Smith, (the Mother), on her own behalf and her son,

G.C., III, and files this complaint against the above named defendants for Federal and

1

State Claims after a final agency decision from the Illinois State Board of Education and alleges the following upon information and belief:

References to Federal, State and Defendants laws and regulations cover the following statutes:

1. Individual with Disabilities Education Act 2004(IDEA)
2. Rehabilitation Act of 1973, Section 504, as amended
3. American with Disabilities Act of 1990 (ADA), Title II
4. Illinois School code and the Illinois School Student Records Act
5. Crete-Monee School Defendants 201-U special Education Procedures Assuring the Implementation of Comprehensive Programming for Children with Disabilities
6. Mental Health and Developmental Disability Confidentiality Act (740 ILCS 110)
7. Title IX of the Education Amendments of 1970
8. Fourteenth Amendment, Equal Protection Clause, 42 U.S.C. Section 1983

## JURISDICTION AND VENUE

1. This case arises under the United States Constitution and 42 U.S.C. Sections 1983 and 1988, as amended. This Court has jurisdiction in this matter pursuant to 28 U.S.C. Sections 1331 and 1343. The declaratory and injunctive relief sought is authorized by 28 U.S.C. Sections 2201 and 2202, 42 U.S.C. Section 1983 and Rule 57 of the Federal Rules of Civil Procedure.

2. Jurisdiction is conferred upon this court by 28 U.S.C. Section 1331, 1343(3) and (4), 42 U.S.C. Section 1983, 1988, the Individuals with Disabilities Education Act (IDEA), Section 504 of the Rehabilitation Act of 1973 (Section 504), the American with Disabilities Act (ADA), and the Due Process and Equal Protection Clauses of the United States Constitution.

2

3. This Court has pendant jurisdiction to adjudicate any State claims which arise out of the same facts as the federal claims asserted herein.

4. Venue is properly laid in the United States Defendants Court for the Northern Defendants of Illinois as authorized by 28 U.S.C. Section 1391 and 1392 because substantially of the events that give rise to the claims in this action occurred in the Northern Defendants of Illinois.

5. All conditions precedent to the filing of this Complaint have occurred or been performed.

## THE PARTIES

## PLAINTIFFS

## VANESSA SMITH, MOTHER

6. Vanessa Smith is the birth Mother of G.C. III, the student. She is a citizen and resident of the State of Illinois. She is African American and has always been listed in school records as the student's mother, which included her current contact information. She has participated in his educational, medical, social, and family upbringing from his date of birth. She shares custody of the student with his father G.C., Sr. At all relevant times, the Mother notified the Defendants of her correct contact information, which included her residential address, mailing address, telephone number and email address. At relevant times, Mother communicated with Defendants using email and telephone, and in-person visits.

## G.C., THE STUDENT

7. . G.C., age 12, is an African American male child. G.C. is a citizen and

3

resident of the State of Illinois. He appears herein by and through his Mother and legal next friend Vanessa Smith. He was recently promoted to the 8th grade at Crete Monee Middle School, for the upcoming school year of 2015-2016. He was promoted from the 6th to the 7the grade with a grade point average of 1.5 GPA. He was promoted from the 7th to the 8th grade with a grade point of average of 1.0 GPA.

8. G.C.'s impairment substantially limit the operation of major life activities of learning, thinking, communicating, and behaving.

9. G.C., a student enrolled in the Defendants, is a qualified individual with a disability. 42 U.S.C. Section 12131(2).

10. G.C. has been on a 504 Plan for the past 4 years and continues on such a plan to this very day. G.C. has been diagnosed with attention deficit hyperactivity disorder (ADHD). This is based upon a medical diagnosis, 4 years of failing grades in the Crete Monee School Defendants, over 40 school suspensions, excessive school absences and tardiness, behavioral problems and teacher observations.

11. The Defendants determined that G.C.'s disability substantially limited a "major life activity," the ability to learn, think, concentrate, focus, read, and do math and other academic skill. His disability prevented him exercising accountability, responsibility for school rules. G.C.'s ADHD severely affected his ability to obtain the grades he was capable of earning. When given achievement tests, G.C. tested in the average to above average range. However, in the classroom, his best grades were only "D's" and "F's".

12. His records reflect that he tested poorly in class and failed to complete

4

homework assignments.

13. His Disability caused him to constantly neglect his class work. In Math, during the 7th grade, he failed every class room quiz. His ability to focus and think was stifled by his disability. His teachers confirmed this conclusion by completing a checklist of ADHD symptoms that applied to G.C.

14. The Defendants provided the Mother with over 100 pages of "Daily Check In Check Out Forms" completed by every teacher or school personnel that G.C. came in contact with for the school day. Every page contains at least 2 to 5 ADHD related comments out 8 supporting the negative impact that G.C.'s ADHD was having on his education.

15. His numerous suspensions in 6th and 7th grade were directly related to his ADHD. He exhibited problems conforming to school rules and policies.

16. His medical doctor, school counselors, school psychologist recommended that he obtains outside psychological counseling to address his behavior problems.

17. The Defendants never provided outside or professional counseling for G.C. at any time.

18. He never received any tutorial services at any time.

19. He never received a proper independent educational evaluation.

20. G.C. was denied access to the Defendants' extracurricular activities, and he was not given an equal opportunity to participate in such activities. Further, no accommodations were made for him to participate in these activities.

21. He never received any interventional behavioral services to help him receive

5

an educational benefit equal to nondisabled students pursuant to IDEA or Section 504 requirements.

22. Although the Defendants acknowledged that G.C. had ADHD, the Defendants refused to provide G.C. with special education or professional services that were appropriate for his diagnosis.

23. The Defendants determined that G.C. was ineligible for special education, but he was listed as having a specified impairment which severely affected his ability to learn, achieve, and progress in the Defendants educational system.

24. In sum, his disability adversely affected his educational performance.

25. For the past for 4 years, his father has sought disability services from the Defendants to enable G.C. to learn and receive school benefits from an education like other children who did not have this disability.

26. The Defendants did not provide G.C. with any specially designed services that were appropriate for his ADHD.

27. The Defendants has failed or refused to identify G.C. as a child who has a disability which qualifies him for special education services.

28. The Defendants has always unlawfully denied G.C. an individual education plan, special services and education, in violation of Federal, State, Defendants laws and regulations.

## (NON PARTY) George Cox Jr, THE FATHER

29. George Cox Jr and the Mother have never been married, nor have they ever lived together, with or without children. He is also a part of the student's, medical,

6

social, family and educational welfare. He was not a party to the ISBE administrative hearing process. He is not a party to this lawsuit.

## DEFENDANTS

### ISBE (Illinois State Board of Education)

30. The ISBE is the governing board for education in the State of Illinois.

31. The Mother filed a request for an impartial due process hearing on June 17, 2015 on behalf of herself and G.C. The request was made for violation of IDEA, Section 504, Illinois School Code, Illinois School Records Act, and Title VI of the Civil Rights Act.

32. The Defendants filed a motion to dismiss the mother's complaint on the basis that she did not have standing to request a due process hearing on behalf of herself or her son. The hearing officer granted the motion to dismiss and dismissed the Mother's claims on behalf of herself and her son, thereby dismissing her entire due process hearing request. A copy of the dismissal order is attached to this complaint. This dismissal constitutes a final agency decision for the State of Illinois.

33. The ISBE decision violates the Mother's and G.C.'s rights, privileges and benefits under IDEA, Section 504 of the Rehabilitation Act, and the below cited Federal, State and local rules, regulations, guidance and policies.

34. Based upon her appeal rights, the Mother timely appeals the final agency decision by the filing of this complaint.

35. The Plaintiffs are seeking declaratory and/or injunctive relief.

## CRETE MONEE COMMUNITY SCHOOL DEFENDANTS BOARD CM 201U

7

36. Crete-Monee School Board (Defendants) is a school Defendants, located in the State of Illinois. It receives Federal financial assistance from the U.S. Department of Education. G.C. has been receiving education in the Crete-Monee School Defendants from 2000-2015. The Defendants was responsible for providing education to G.C. during the past four years, which is his 4th through 7th grade, 2011-2015. He is still a student in the school Defendants.

37. The Defendants is a person subject to suit within the meaning of 42 U.S.C. Section 1983. It is vested with the supervision of schools within Crete, Illinois.

38. The Defendants, along with its respective departments, agencies, and other instrumentalities, is a public entity within the meaning of 42 U.S.C. Section 12131(1), and is therefore subject to Title II of the ADA.

39. The Defendants is a body politic and corporate organized and existing under the laws of Illinois and is the Local Education Authority (LEA) responsible and obligated under Individual Disabilities Education Act (IDEA).

40. The Defendants conducted an evaluation to determine whether the G.C. was eligible for an Independent Education Plan (IEP), 504 Plan, Special Education Services, and/or Accommodation services.

41. The Defendants is required to organize a team of individuals to conduct an assessment, make a determination and perform various duties in accordance with Federal, State, and School Defendants Regulations.

42. The Defendants is responsible for ensuring that G.C. is not discriminated against in its provision of education, services and benefits on the basis of race, sex or

8

disability. The Defendants is responsible for providing services to ensure that G.C. receives the same level of education and benefits and services that other nondisabled students receive from the Defendants.

43. As a recipient of Federal assistance under Part B of the Individual with Disabilities Education Act (IDEA), the Defendants is required to make sure that children with disabilities and their parents are guaranteed certain "procedural safeguards." These safeguards are necessary for a free, appropriate public education. The failure to provide these safeguards amount to a denial of a free appropriate public education (FAPE), which is guaranteed under Federal and State law to G.C.

44. The Mother files this complaint, on her behalf and G.C.'s behalf, against the Defendants for the failure or refusal to fulfill the educational duties as required by law and discriminating against her son, G.C., on the basis of his race, African American, gender, and disability, in violation of Federal, State, and Defendants laws. Mother further presents that such actions were negligent and/or intentional acts. Those actions:

a. deprived her son of the education that he is entitled to receive;

b. denied him the education that other children without disabilities received;

c. denied him the benefits and privileges of programs and activities that other children without disabilities received;

d. unlawfully discriminated against him based upon his race and sex, being an African American male child, by unlawfully conducting a disability determination, evaluation, placement, services, and monitoring as set forth under Federal and State law;

e. unlawfully failed to prepare an IEP for G.C., did not take steps to make sure that the Mother participated in the IEP process, and refused to include all of the necessary participants in the IEP meeting.

f. the Defendants did not make a good faith effort to help G.C. achieve the goals and objectives of the 504 Plans.

g. the Defendants denied G.C. the needed opportunity to attend summer classes or extended year services when necessary to avoid significant regression over the summer.

9

h. the Defendants did not provide the services or accommodations listed in the 504 Plans, thereby denying G.C. what little services the Defendants was reluctant to provide;

i. the Defendants refused to provide the Mother with the required notices pursuant to IDEA;

j. the Defendants denied the Mother the opportunity to participate in G.C.'s education;

k. the Defendants refused to give the Mother copies of G.C.'s educational records or allow her to view the educational records for the four requested years.

l. the Defendants retaliated against the Mother asserting the rights, benefits and privileges afforded to her and G.C. under the below stated Federal, State and Local laws.

45. The Defendants' actions complained of were deliberate, intentional or with complete disregard for the harm caused to the Mother or G.C.

46. The Plaintiffs are seeking declaratory and/or injunctive relief.

## NAKIA K. HALL, School Board President

47. Ms. Hall (Hall) is the Crete Monee School Board President. At relevant time, he was acting under color of state law.

## NATHANIAL CUNNINGHAM, Crete Monee Superintendent

48. Mr. Nathanial Cunningham is the Superintendent of the Crete Monee School Defendants. He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

## MONICA SPENCE, Crete Monee Assistant Superintendent

49. Ms. Spence (Spence) is the Assistant Superintendent for Crete Monee School Defendants. She is sued for damages in her individual capacity and for declaratory and injunctive relief in her official capacity.

## ELLEN BELOTTI, Crete Monee Director of Special Education

59. Ms. Belotti (Belotti) is the Crete Monee Director of Special Education. She is

10

sued for damages in her individual capacity and for declaratory and injunctive relief in her official capacity.

### DINA LEFTAKIS, Crete Monee School Psychologist

51. Ms. Leftakis (Leftakis) is the Crete Monee School Psychologist. She is sued for damages in her individual capacity and for declaratory and injunctive relief in her official capacity.

### KEVIN VAN COTT, Crete Monee Behavioral Specialist

52. Mr. Kevin Van Cott (VanCott) is the Crete Monee Behavioral Specialist. He is sued for damages in his individual capacity and for declaratory and injunctive relief in his official capacity.

### KOKOSIS CHRISOS, Crete Monee Middle School Principal

53. Ms. Chrisos (Chrisos) is the Principal of the Crete Monee Middle School. She is sued for damages in her individual capacity and for declaratory and injunctive relief in her official capacity.

### KATHRYN BOLSTER, Crete Monee Middle School Case Manager

54. Ms. Bolster (Bolster) is the Crete Monee Middle School Case Manager. She is sued for damages in her individual capacity and for declaratory and injunctive relief in her official capacity.

55. At all times, Defendants acted under color of state law.

### FACTS

56. In June 2015, Mother became aware that G.C. had basically flunked (F) math and science at Crete Monee Middle School. She contacted Ms. Lindsey by telephone,

11

a school counselor at Crete- Monee Middle School, to determine whether G.C. needed to attend summer school for the summer 2015 for math and reading.

57. After checking G.C.'s grades in the computer, Ms. Lindsey responded that the Defendants would not provide summer school for G.C. to make up his failing grades. However, she agreed with the Mother that it would be a good idea for the Mother to get him into summer school, even though the Mother may have to pay for it, so that he would have a fair start for the 8th grade.

58. The Mother asked if G.C. would be held back in the 7th grade because his grade point average was so low, 1.0 GPA. Ms. Lindsey informed the mother that he would not be held back because students at his level are not held back; they are promoted. The Mother expressed her concern that G.C. was being promoted to the next grade even though his grades were below State standards for promotion.

59. Ms. Lindsey further informed the Mother that G.C. is in a class where the majority of the students are black males. In this class, 18 students must complete a behavior conduct sheet which requires every teacher to monitor and record the student's behavior for each class. None of the students in the class participate in physical education or nonacademic activities.

60. The majorities of the students in the class with G.C. have behavior problems and are often disciplined. None of the students in the class with G.C. have a GPA higher than a 2.0.

61. Ms. Lindsey then informed the Mother that G.C. had a 504 Plan in effect. The Mother asked, "What was a 504 Plan?" Ms. Lindsey then referred the Mother to

12

speak with Ms. Spence, the Assistant School Superintendent.

62. Ms. Lindsey did give an overall summary explaining what a 504 Plan was about. However, she did not provide any information to the Mother about G.C.'s 504 Plan.

63. The Mother spoke with Dina Leftakis, the School Psychologist who is listed on the 504 Plan team dated 4/21/2015 by telephone. Initially, Ms. Leftakis refused to speak with the Mother concerning her son. Ms. Leftakis informed the Mother that she was leaving the Defendants for the summer and would be unreachable. She informed the Mother that she did not have any documents to provide to the Mother concerning G.C. Ms. Leftakis informed the Mother that her only role in the 504 Plan as school psychologist was to assemble the parties and conduct the meeting. She explained that she did not examine G.C. nor had she ever met him. Ms. Leftakis is not familiar with the student either.

64. On June 10, 2015, the Mother sent an email to Ms. Leftakis, copied to Ms. Spence as well requesting documents related to the 504 Plan that she was in charge of conducting on G.C.'s behalf. As of July 7, 2015, this request for documents has been ignored my Ms. Leftakis and the Defendants.

65. Katie Bolster, the case manager who is listed on the 504 Plan team dated 4/21/15, has not been located and cannot be found by the Defendants. She has never met the student and is not familiar with him.

66. Christina Flores-Colbert, the General Education Teacher, is listed on the 504 Plan team dated 4/21/15. G.C.'s final grade in her class was a "D."

13

67. Ray Lawrence, the Assistant Principal of Crete Monee Middle School, is listed on the 504 Plan team dated 4/21/15. The Mother did speak with him concerning his contact with her son. Mr. Lawrence's contact with the Mother's son resulted in at least 25 school suspensions during the 2014-2015 school year. During the same year, the student was recorded as being tardy at least 40 times. These matters were within Mr. Lawrence's duties as Assistant Principal. He was acquainted with the Mother's son.

68. Kevin Van Cott is listed as a behavior Specialist on the 504 Plan team dated 4/21/15. He has not been located and cannot be contacted. He has no contact with the Mother's son and is not familiar with him.

69. Mother was told to speak with the school counselors, Ms. Lindsay, Ms. Wilkinson directly.

70. When Mother came to the Crete Monee Middle School to speak with school counselor Ms. Lindsey, Ms. Lindsey spoke with the Mother. Due to the short period of time Ms. Lindsey had to speak with the Mother, Mother asked for a copy of all documents related to her son. Ms. Lindsey stated that she did not have any documents. Upon further questioning, Ms. Lindsey repeated that she did not have any documents to provide to the Mother that were related to her son. Mother provided Ms. Lindsey with a handwritten document requesting any and all documents should she discover any.

71. Mother then spoke with Ms. Wilkinson. On a previous occasion, the Mother spoke with Ms. Wilkinson concerning the counseling she was giving G.C. Ms. Wilkinson informed the Mother that she provided Grief group counseling to G.C. and that the

14

counseling was only for 6 weeks. The Mother informed Ms. Wilkinson that G.C. had not experienced death or separation. She further informed Ms. Wilkinson that she has custody of G.C. every Friday to Monday. Mother asked Ms. Wilkinson what type of grief counseling was she providing to G.C. Ms. Wilkinson replied that "oh, it will help him."

72. At this current meeting, Ms. Wilkinson refused to provide the Mother with any documents. She stated that the Mother was not entitled to receive any documents. The Mother handed her a hand written document requesting any documents she may discover related to her son, G.C. and then left Ms. Wilkinson. To date, Ms. Wilkinson has not provided any documents or information concerning G.C.

73. Mother next spoke to Mr. Hill. Mr. Hill stated that he spoke with G.C. in a group setting. The purpose of the group meeting is to discuss physical aggression. The Defendants nor has Mr. Hill ever provided the Mother with documentation or evidence that he was qualified to provide counseling to address G.C.'s diagnosis and related symptoms identified in his 504 Plan.

74. Mr. Hill stated that he did not provide "counseling" in the "normal" sense. The group met for about 20 minutes each week. Mother asked Mr. Hill if he had any documents related to his contact with her son. Mr. Hill replied that he did not have any documents, nor did he maintain any documents. When Mother asked Mr. Hill how he could determine if progress was being made, he did not articulate a response. Mr. Hill responded that he had nothing further to say and could not provide any documents. Mr. Hill then told Mother to go see Ms. Deck in the Special Education Department. Mr. Hill informed the Mother that Ms. Deck sent G.C.'s file to him to provide the service.

75. With respect to all of the aforementioned persons, the individuals and the Defendants has failed or refused to provide any information regarding their credentials, experience, and authority to conduct such services on the Defendants' behalf, position duties, professional affiliations and licenses to the Mother. They have not provided any documentation that counseling services were provided to G.C.

76. When the Mother questioned her son G.C. about his time with Mr. Hill, G.C. replied that he enjoyed spending time with Mr. Hill because it allowed him to get out of class and they played games, such as UNO.

77. Immediately after speaking with Mr. Hill, Mother then went to speak to Ms. Deck in the Special Education Department, who is located in another building, driving distance. The Mother explained to Ms. Best that she was trying to get a copy of the 504 Plan concerning her son. The Mother explained how she had been trying to get it from the 3 counselors of the Crete Monee Middle School and the Sixth Grade Center.

78. Ms. Best apologized for the misinformation and informed the Mother that she did not have the 504 Plan either because she was the receptionist. She stated that she would forward the request to the responsible person.

79. The Mother then sought the assistance of Ms. Spence. The Mother wrote Ms. Spence a letter seeking her assistance in getting a copy of the 504 Plan.

80. Shortly thereafter, Ms. Spence responded to the Mother's request. Ms. Spence provided a contact person, Brian Wortel, a Special Education Administrator with the Crete Monee School Defendants, and a copy of the 504 Plan concerning her son, G.C.

16

81. Upon reading the 504 Plan and rights attached to the plan, the Mother requested a hearing with the Defendants to challenge the plan. The request was denied by the Defendants. The Mother was informed that only the father could request a hearing. The Mother responded that she disagreed with the decision.

82. Previously, the Mother received G.C.'s school records. She requested that a one page police report that was contained in her son's school record be removed pursuant to the Illinois School Records Act. She requested that it be removed because it was not related to his education, was not a permissible document in accordance with the Illinois School Records Act, was misleading, and contained private information. The mother recognized this one page report as part of a report that was done when the Mother was victimized. The victimization did not involve the children, the family home, nor the children's education or welfare. The Defendants denied the Mother's request to remove the document. The Defendants' basis for the denial was that the father did not give the permission to remove it. Again, the Mother expressed her disagreement.

83. Sometime later, June 2015 approximately, the Mother met with Mr. Wortel at the administrative office of the Crete Monee School Defendants. Mr. Wortel could not explain or justify the Defendants failure to not notify the Mother of the schools' actions towards her son with respect to the IEP, 504 Plan, and the required notices. Mr. Wortel was not a part of any of the meetings concerning the Mother's son or any of his 504 Plans. He has no personal knowledge or any knowledge of the evaluation, assessment, services or monitoring of services for the Mother's son.

84. The Mother explained to Mr. Wortel that the Crete Monee Middle School was

17

very hostile towards the mother and threatened to have her arrested after school personnel learned she appeared before the school board to challenge the school's lack of action when her daughter was bullied. The Mother further expressed to Mr. Wortel that she knows that she has a right to documents and to participate in her son's education. However, the counselors were very defensive and refused to provide any documents and that is why she needed Ms. Spencer's assistance. The Mother then provided Mr. Wortel some related documents. Mr. Wortel provided the Mother copied documents from G.C.'s school records.

## DEFENDANTS' FOURTH AND FIFTH GRADE WRONGFUL IDEA ACTIONS AND SECTION 504 DETERMINATIONS

85. The Defendants conducted an IEP assessment, evaluation on G.C. during his fourth and fifth grade. At no time did the Defendants notify the Mother of the assessment, evaluation or determination.

86. Without participation of either parent, the team determined that G.C. was ineligible for an IEP.

87. Without participation of either parent, team determined that G.C. was disabled due to his ADHD.

88. Without participation of either parent, team determined what accommodations the Defendants would provide to G.C.

89. Without participation of either parent, the team decided that no counseling or tutorial services would be provided to G.C.

90. At no time did the Defendants notify the Mother of G.C.'s behavior or

18

discipline problems that were occurring in school and affecting his education.

91. At no time did the Defendants notify the Mother of her rights pursuant to IDEA or Section 504, or rights under Illinois State law.

92. At no time did the Defendants notify the Mother of G.C.'s failing grades, which made him ineligible for promotion to the next grade.

93. At no time did the Defendants notify the Mother of G.C.'s placement and change of placement.

94. The Defendants chose to intentionally deny the Mother the right to receive the required notices under federal and state law to participate in the IEP and Section 504 process.

95. The Mother has a right to be an equal participant in the IEP and Section 504 process.

96. Upon becoming aware of the Defendants' denial of her rights pursuant to IEP and Section 504, the Mother notified the Defendants of her objections to those plans and requested a hearing. The Defendants refused to provide the Mother with a hearing at the local level.

97. At no time did the Mother consent to IEP and Section 504 evaluations.

98. At no time did the Mother consent to the release of G.C.'s educational records.

99. Mother requested to view all of G.C.'s educational records for the fourth and fifth grade. To this date, those records have not been completely provided. The Defendants has continued to refuse to provide the requested documents.

19

## DISABILITY DETERMINATIONS AND DOCUMENTS
## PROVIDED BY THE DEFENDANTS TO THE MOTHER IN JUNE 2015

100. Mr. Wortel provided the following documents to the Mother at the meeting: Parent/Guardian Notification of Conference Recommendation, dated February 3, 2014; Section 504 Plan, dated February 24, 2014; Parent/Guardian Notification of Decision Regarding a Request for an Evaluation, dated December 11, 2014; Section 504 Plan, dated February 9, 2015, and Section 504 Plan - AMENDMENT, dated April 21, 2015.

## DEFENDANTS SIXTH (6) GRADE IEP DETERMINATIONS AND 504 PLAN

101. The Defendants, by determination made on February 4, 2014, by Nicole Hrapek, School Psychologist/LEA Rep., concluded the G.C. was not eligible for special education and related services. The conference, which was an eligibility review, was held on February 4, 2014. It was attended by Nicole Hrapek, school psychologist and Mona Shymkus, the Special Education Teacher, and G.C., the father.

102. At no time did the Defendants provide the Mother with prior written notice of the request for an evaluation, or of the conference. The Defendants did not provide the Mother with prior written notifications as required by law containing the procedural safeguards outlined in Federal, State and Defendants laws and regulations.

103. Upon reading the report, it was prepared solely by the school psychologist, not the team. This determination was made while G.C. was in the 6th grade attending the Crete-Monee Sixth Grade Center, for the school year 2013-2014.

104. Subsequently, on March 24, 2014, while G.C. was still attending the Sixth Grade Center, the Defendants prepared a 504 Plan.

105. The following persons signed the sign-in sheet for the 504 Plan meeting:

20

Nicole Hrapek, psychologist, Megan Corrigan, school social worker, Mona Shymkus,

special ed teacher, Carrie Tell, Teacher, G.C., parent.

106. The diagnosis listed on the Plan is "Attention Deficit Hyperactivity Disorder

(ADHD)-Doctor has not recommended medication at this time. Dr. Lin Roberts

recommends classroom modification and an individualized educational plan that

addresses inattentive and impulsive behaviors to improve school functioning."

107. The Defendants determined that G.C. "does have a physical or mental

impairment which substantially limits one or more life activities, but: Child does NOT

have a disability under the Individuals with Disabilities Act (IDEA) Child does not need

special education."

The Section 504 Plan states further "AREAS AFFECTED BY DIAGNOSIS:
-Attention and Distractibility
-Remaining on-task and focused for extended periods of time
-Impulsivity-G.C. often blurts out without raising his hand.
-Difficulty with peer relationships
-G.C. has difficulty with controlling his anger. He is easily agitated and often reacts in an angry manner."
This 504 Plan provides the following Accommodations for G.C.:
-Allow cool down time when angry
-Allow opportunities for movement
-Separate passing periods
-Preferential seating near the teacher
-Classroom tests should be taken in a small group with fewer distractions
-Support from classroom aide in all academic classes
-Break up longer tests into shorter chunks
-Participate in Check in Check out program to monitor behavior

108. This 504 Plan does not provide a behavior intervention plan for G.C..

However, weekly social work support was listed as being required. This is all the March

24, 2014 Plan provided for G.C. and his disability, for his 6th grade education.

109. G.C. was promoted from the 6th grade to the 7th grade with a 1.5 GPA.

110. On December 11, 2014, the Defendants notified the father that G.C. was not eligible for an IEP or Special Education services. A behavior intervention plan was not provided for G.C. The school made some accommodations.

111. The accommodations did not address the impairments identified in the 504 Plan.

112. The accommodation did not provide a plan as to how the accommodations would be monitored to determine whether the tasks designed to address G.C.'s deficiencies.

113. The 504 Plan was not distributed to all of G.C.'s teachers.

## DEFENDANTS' SEVENTH (7) GRADE IEP DETERMINATIONS AND 504 PLAN

114. The next 504 Plan was prepared on February 9, 2015. At the Crete Monee Middle School, grade 7.

115. The signatories are: Dina Leftakis, school psychologist, G.C., parent, Tiffany Gipson, math teacher, Rob Taylor, reading teacher, Kathryn Bolster, case manager, Jason Hill, social worker.

116. The February 9, 2015 504 Plan diagnosis remained the same, ADHD. The areas affected by the disability grew worse: "Attention/Focus: Easily distracted, difficulty staying on task, working independently, following directions and classroom procedures- Impulsivity: G.C. often blurts out without raising his hand - Difficulty with peer relationships." Reasonable accommodations remained the same.

117. The February 9, 2015 504 Plan did not provide G.C. with a behavior intervention plan and provided only weekly social work support (20 minutes per week),

22

which was the same service provided in the previous year 504 Plan.

118. While this February 9, 2015 504 Plan was in effect, G.C. was promoted from the 7th grade to 8th grade with a GPA of 1.0 during this school year of 2014-2015. He was dropped from 3 classes, which included physical education. He was excluded from all nonacademic classes, field trips and sports. In fact, he had been excluded for the entire 2014-2015 school year. At no time did the Defendants ever notify the parents of this exclusion. He was suspended at least 15 times from school. He committed theft and destruction of school property. He was not educated in the least restrictive school environment. Further, he was not afforded the opportunity to gain the missed education that other students without a disability were allowed to obtain at the Defendants.

119. Finally, a revised 504 Plan was prepared in April 21, 2015. The revision was listed as an "AMENDMENT." This Plan was prepared at Crete Monee Middle School during G.C.'s 7th grade, approximately 1 ½ months prior to the end of the school year. Although G.C.'s disability during the past four years was always behavioral, the Defendants was just now providing him with a behavior intervention plan.

120. This Amendment was done without parental consent or notice to the Mother. It was done for the explicit purpose of adding a false functional behavioral assessment (FBA) done by Kevin Van Cott.

121. In April 2015, The FBA simply put in writing what the Defendants had already implanted in August 2015, without proper procedures, notices, assessment, evaluations and a required meeting.

DEFENDANTS' FALSE FUNCTIONAL BEHAVIORAL ASSESSMENT

23

122. The assessment was done by K. Van Cott, the Crete Monee behavior specialist, as the interviewer, and Dina Leftakis, the school psychologist and Karen Bolster, the case manager as participants. None of these persons have ever met G.C. nor are they familiar with him. The behavior assessment was completed without the parents input or participation.

123. Although Mr. Van Cott is listed as the interviewer, he has never met G.C., never spoke to G.C., and never interviewed G.C.

124. His FBA contains substantial false statements that made knowingly, intentionally and with complete disregard for the harm that false statements would cause G.C.

125. The Mother was never notified of any meeting, she was denied participation, her consent was never given. The Defendants did not comply with any procedural safeguards.

126. The purpose of the April Amended 504 Plan was to prepare a functional behavior assessment (FBA) on G.C. For the past four years, the Defendants refused to provide G.C. with a FBA even though is diagnosis of ADHD and behavior was clearly getting in the way of his learning.

127. Upon review of the documents, specifically the Amended 504 Plan dated April 21, 2015, provided by the Defendants which includes the FBA prepared for G.C.:

    a. It did not summarize the findings of the functional behavioral assessment;
    b. It did not summarize prior interventions implemented;
    c. It did not describe any behavioral interventions to be used, including those aimed at developing or strengthening more appropriate behaviors;
    d. It did not identify the measurable behavioral changes expected and methods of evaluation;

24

e.  It did not identify a schedule for a review of the intervention's effectiveness; and

f.  It did not identify provisions for communicating with the parents about G.C.'s behavior and coordinating school-based and home based interventions.

128. Item "a" through "f" are required to be included in the 504 Plan when it is determined that a student should be assessed for an interventional behavior plan. The Defendants failed or refused to provide this assessment for G.C. in his IEP determination and 504 Plan.

129. The Defendants violated its own regulations when it failed or refused to furnish the Mother with the guidelines on the use of behavioral interventions within 15 days after their adoption.

130. Although the Defendants had already taken the action of removing G.C. from physical education, nonacademic activities, field trips, and not providing him education in the least restrictive setting, the April 21, 2015 Amended 504 Plan was revised to reflect those changes after the fact.

131. The Defendants' action is a direct violation of Federal, State and School Defendants regulations which require that a 504 Plan team conference be held to assess and evaluate the student's plan, along with parental notices and consent, prior to changing a student's 504 Plan.

132. Also, the April 21, 2015 Amended 504 Plan was revised to reflect that G.C. was denied being denied academic and organizational support. Although the 504 Plan lists that these services are to be provided. The Defendants never provided these services to G.C..

25

133. The April 2015 Amended 504 Plan was revised without describing how new behaviors could be taught to G.C. to assist him achieving his educational goals.

134. The April 2015 Amended 504 Plan was never distributed to G.C.'s teachers so that it could be implemented.

## ADDITIONAL DEFENDANTS IEP AND 504 VIOLATIONS FOR THE 6TH AND 7TH GRADE

135. The Defendants improperly denied G.C. an IEP Plan to service his disability to ensure that he receive an education equal to, as much as possible, to other children in the Defendants that were not disabled, and to ensure that he was being unlawfully discriminated against on the basis of his race, gender or disability.

136. The Defendants failed to:

## DEFENDANTS' FAILURE TO CONVENE A PROPER IEP TEAM

137. In accordance with IDEA, the IEP team must include:

a. The child's parents
b. At least one regular teacher, who will be responsible for implementing the plan
c. At least one special education teacher, who will be responsible for implementing the plan
d. A representative of the school Defendants, who can supervise, knowledgeable about the curriculum, Defendants' resources and has the authority to commit those resources
e. Someone who is qualified to interpret the instructional implications of the evaluation results and make an informed decision as to whether the child needs special education and related services.

138. On all of the documents provided by the Defendants listing the members of the IEP/504 Plan team members, it failed to include a member who is qualified to interpret the instructional implications of the evaluations. It failed to

26

include someone who is responsible for implementing some if not all of the plan. It failed to include someone who had the authority to commit resources to fulfill the plan. It refused to include the Mother.

139. Also, Section 504 requires that the Defendants ensure that the determination that a student is eligible for special education and/or related aids and services be made by a group of persons, including persons knowledgeable about the meaning of the evaluation data and knowledgeable and the placement options. In all the Plans, which include disability determinations, eligibility for IEP, 504 Plans, Special Education and Accommodations, the decision was solely made by the school psychologist. Afterwards, the school psychologist announced the decision to the team. This is a direct violation of Section 504.

140. The Defendants' Team was therefore improperly comprised and failed to meet the minimum requirements set forth in the Federal, State, and Defendants laws and implementing regulations. Such violations denied G.C. the right to have an a proper evaluation, eligibility determination for his ADHD and receive proper services so that he would receive the education, benefits and services that he is entitled to receive under law. The failure and refusal to provide services as set forth by law was intentional or grossly negligent, and without lawful justification, based upon G.C.'s race, gender and disability.

DEFENDANTS' IMPROPER IED ASSESSMENT

141. G.C. is qualified for an IEP under IDEA. The Defendants determined that he had ADHD, which meets the requirements set forth for "other health impairment."

27

This issue was resolved in 1991. The Department of Education issued a Policy Clarification Memorandum directing schools to include ADHD as a covered disability under the IDEA.

142. The Defendants refused to comply with the law. It unlawfully and without basis, determined that G.C. was not eligible for services pursuant to IDEA, there by denying him a FAPE. Time has proven the Defendants was wrong. After at least 4 years of 504 Plan services, G.C. academic skills have declined, his behavior has severely worsened, and he is basically excluded from class, and offered no services, except given additional time to "act out."

143. The Defendants is prohibited from using a measure or assessment for purposes different from the purpose for which the measure was designed. The testing materials contained in the IEP and 504 Plan evaluation, determinations, placements and testing were not designed for testing on students with ADHD or suspected ADHD or behavioral problem. Therefore, the testing used by the Defendants was in violation of the IDEA, Section 504 and the Illinois School Code, which concerns evaluations.

144. An IEP would have ensured him an appropriate education based upon his unique educational needs.

145. Furthermore, the Defendants failed, as required by law, to evaluate G.C. for all suspected disabilities, pursuant to 34 CFR 300.300-306, 105 ILCS 5/14/-8.02.

146. The Defendants was aware that over a four year period, G.C.'s grades were declining, his behavioral problems were increasing, and he was not testing as well as his abilities showed. This constituted a severe discrepancy because there was a large

28

or significant difference in ability and achievement.

147. Because G.C. was of average intelligence, according to some tests given to him, but not performing at that same level in his grades, he should have been referred for a full evaluation to what was causing the discrepancy. He has never been referred for such an evaluation in spite of four (4) years of decline.

148. At no time did the Defendants evaluation G.C. for a Specific Learning Disability (SLD) as required by 34 CFR 300.309; 105 ILCS 5/14-8.02.

## DEFENDANTS' FAILURE TO PROVIDE REQUIRED NOTICES

149. The Defendants is required to provide to the Mother a notice when the child is initially referred or a parent request an evaluation. The Defendants failed to provide this notice to the Mother.

150. The Defendants is required to provide to the Mother a notice of the right to an independent evaluation. The Defendants failed to provide this notice to the Mother.

151. The Defendants is required to provide to the Mother a notice of the right to an opportunity to present and resolve complaint concerning the IEP denial, 504 Plan, denial of special education and challenge to accommodations, including: a) the time period in which to make a complaint; b) the opportunity for the Defendants to resolve the complaint; and c) the availability of mediation. The Defendants failed to provide such notice. When the Mother requested such an opportunity to complaint, the Defendants unlawfully denied her complaint and responded that she did not have the right to complain about the Defendants' action towards her son G.C.. This is violation of Federal, State, and Defendants law and regulations.

29

152. Based on the denial of these rights, G.C. was denied the benefit of receiving a proper evaluation, determination, services and education which guaranteed to him under the law.

## DEFENDANTS' IMPROPER CONSIDERATION OF ALTERNATIVE SCHOOL CHANGE

153. The Defendants is required to provide to the Mother notice concerning the procedures for students who are subject to placement in an interim alternative educational setting. The Defendants failed or refused to provide this notice to the Mother. Assistant Principal Lawrence notified the Mother, informally, that G.C. was being considered to be transferred to the Alternative School based upon his behavior. However, prior to him being transferred, it was decided (by whom the Mother was not told) that the Defendants would separate him from the other students, remove him from as many classes as possible and placed in a room by himself, and exclude him from activities prior to transferring him to the alternative school due to his behavior. This action constitutes a change of his 504 Plan. Prior to a change becoming effective, the Defendants is required to conduct an re-evaluation of G.C.'s 504 Plan by convening a 504 Plan team. The Defendants failed or refused to do so, which was a violation of Federal, State, and Defendants law and regulation.

154. At no time was the Mother made aware of the procedures and rights, as required by law, available to her or G.C. in this matter to ensure that he was being lawfully educated and not unlawfully discriminated against based upon his disability, race or gender.

30

## DEFENDANTS' REFUSAL TO CORRECT SCHOOL EDUCATIONAL RECORDS

155. The Defendants is required to provide to the Mother the opportunity to examine G.C.'s educational records. Section 4 of the Illinois School Student Records Act, 105 ILCS 10/4, provides that (c) Information contained in or added to a school student record shall be limited to information which is of clear relevance to the education of the student. The Mother has a right to challenge information contained in a school student record which is incorrect or is not relevant to the student's education.

156. Federal law requires the Defendants to give the Mother the opportunity to inspect, review, and copy G.C.'s records related to:

a. Identification of him as a child with a disability
b. His evaluations for special education
c. Records related to his educational placement
d. Records related to the provision of a free, appropriate public education
e. The right to have the records within 15 days of the request
f. The right to amend any of G.C.'s information contained in the records that is inaccurate, misleading or not for educational purposes. If the school refuses to amend the record or delete the record, the Mother has a right to a haring.

157. When the Mother became aware of misleading, false and improper documents contained in G.C.'s school file and requested that the documents be removed. She provided a written request, which requested that the documents be removed because they were false, inaccurate, and not a permissible document to be maintained in G.C.'s school record. The school denied the request because it said the father did not give permission to remove it.

158. After the denial, the Mother requested a hearing on the denial from the Defendants. The hearing request was denied also.

159. This is a violation of the Illinois School Records Act, IDEA, and Section 504,

31

in addition to other Federal, State and the Defendants laws and regulations. Moreover, the Defendants never notified the Mother, as required by law, that she was entitled to a hearing if she requested a hearing on the matter.

## DEFENDANTS' LACK OF "PRIOR WRITTEN NOTICE" TO MOTHER OF PROPOSED DEFENDANTS ACTION

160. The Defendants conducted an evaluation pursuant to the IDEA based upon G.C.'s behavior, school records, doctor's statements, disciplinary record, attendance records, and teacher statements, among other items.

161. The IDEA requires that "[I]f Crete-Monee School Defendants 201-U has not sent a prior written notice under IDEA's implementing regulations at 34 C.F.R. Section 300.503 to the Parent(s) regarding the subject matter contained in the Parent(s) due process complaint, Crete-Monee School Defendants 201-U must, within 10 days of receiving the due process complaint, send to the Parent a response that includes:..."

162. This requirement is contained in the Defendants' Special Education Procedures as well as the IDEA.

163. The Defendants has had the Mother's due process for more than 10 days, and it has been more than 10 days for a response to be provided to the Mother as required.

164. Therefore, the Defendants is in violation of the IDEA and Defendants laws and regulations.

165. Whenever the Defendants is considering changing G.C.'s 504 Plan, it is required to provide the Mother with written notice of the proposed change at least 10 days before the proposed action. At no time did the Defendants notify the Mother of the

32

action to exclude G.C. from physical education, field trips, shorten classroom

instruction, isolate him from other students, exclude him form nonacademic activities

and field trips.  At no time did the Defendants notify the Mother of the Defendants's

intent to transfer G.C. to an alternative school in the Defendants.

166. Also, any alleged notice that was provided, failed to meet the requirements

set forth in Federal, State, Defendants law and regulations.  Notices of proposed

changes must provide the following;

a.  A description of the action proposed refused by the Defendants;
b.  An explanation of why the Defendants proposes or refuses to take the action,
    including a description of the factors relevant to the Defendants's proposal or
    refusal;
c.  A description of any options the Defendants considered and the reason why
    those options were rejected;
d.  A description of each evaluation procedure, test, record, report or any other
    factors which the Defendants used as a basis for the proposal or refusal; and
e.  A full explanation of all the procedural safeguards available to the parents
    under IDEA, per the procedural safeguards notice.

167. At no time whatsoever, did the Defendants comply with these Federal,

State, and Defendants notification requirements.  G.C. is entitled to these services

based upon his entitlement to a FAPE and services to enable to receive an education

equal to those without a disability.  The failure to properly assess him for services and

provide those services, and the denial of his proven and irrefutable disability amount to

a violation of his rights under Federal, State and Defendants laws.

168. Moreover, the Defendants failure or refusal to provide the Mother with prior

written notice of the following actions that were taken in the past two years towards G.C.

based upon his identified ADHD disability diagnosis

33

a. The Defendants' unlawful refusal to provide him with an IEP
b. The Defendants' unlawful refusal to provide him with special education
c. The Defendants' unlawful refusal to provide him appropriate accommodations
d. The Defendants' unlawful refusal to provide him with counseling to address his behavioral problems and ADHD
e. The Defendants' unlawful refusal to properly assess him, and consider evidence from numerous sources, including the Mother, as a "group"

169. This refusal or failure to provide the Mother with prior written notice is a violation of Federal, State and Defendants laws and regulations as set forth below. Such a violation is a denial of G.C.'s right to be free from unlawful discrimination based upon his disability, race, and sex. Such violation denies G.C. the education, benefits and services that he is entitled to receive under the law.

## DEFENDANTS' IMPOSITION OF DELAYED PASSING TO THE NEXT CLASS AND DEFENDANTS UNLAWFULLY SHORTENED G.C.'S SCHOOL DAYS, DENIAL OF A FAPE

170. To further separate G.C. from other students, he is required to remain in class for approximately 10 minutes while the other students leave the classroom. Only after the other students have left the classroom is G.C. allowed to leave to go to the other classroom late. The Defendants marks this lateness as a tardy on his attendance reports. This delayed passing may occur at any time of the school day. This delayed passing is directly related to his disability. This unlawful separation denies G.C. the opportunity to participate in or benefit from end of the day school activities, including announcements, final teacher directions and other aids, benefits and services that are provided to nondisabled students during the final 5-45 minutes of the school day.

171. Furthermore, this separation results in a shorten school day for G.C. in violation of Illinois State Laws. G.C. is denied the same school day length that

34

nondisabled students to receive from the Defendants. The Defendants has consciously decided that G.C. will not be provided an equal opportunity to learn and to a school day equal in length to nondisabled students.

172. The Defendants discriminates against G.C. by applying a more limited length of the school day for him as compared to the length of the school day provided for nondisabled students. This limited day has the effect of providing an education that is not as effective as that provided to other nondisabled students. G.C. needs intensive remediation and services as evidence by his extremely poor grades, prior miseducation and denial of equal educational opportunity. With this intensive need, it is inappropriate to shorten his school day, this further impeding his ability to attain outcomes expected for all other nondisabled students by being provided meaningful educational benefit from their education program.

173. To make matters worse, not only did the Defendants shorten G.C.'s school day, the Defendants completely excused him from attending school, whereas nondisabled students are required to attend school. The Defendants decided that it was not worth requiring G.C. to come to school and therefore listed his absence as "excused." This supports the conclusion that the Defendants did not believe that G.C. was worth education and that it did not fulfill its lawful duty to educate him.

174. The Defendants violation of an early passing and shorten or denied school day prevented G.C. from obtaining the education, benefits and services that he is entitled to receive under the law.

## DEFENDANTS' INAPPROPRIATE SUSPENSIONS AND DISCIPLINARY ACTIONS WITHOUT A MANIFESTION DETERMINATION

35

175. For school suspensions involving over 10 total days or a pattern, an evaluation team meeting must be held pursuant to 20 U.S.C. 1415(k), 34 CFR 300.530.

176. The committee must determine whether the conduct that prompted the disciplinary action was a manifestation of the G.C.'s disability, which is behavioral.

177. If the behavior that resulted in the disciplinary action was a result of the disabling condition as determined by the Defendants, the suspension or expulsion is discontinued, and the record is removed from G.C.'s file.

178. G.C. had suspension totaling more than ten (20) days for the 6th and 7th grade school years. Further, during those times, he had 504 Plans in effect for his ADHD and severe behavior problems.

179. Such disciplinary removal constituted a "change of placement" pursuant to Defendants rules, requiring a manifestation review conference and a review of the 504 Plan or IEP. The Defendants failed or refused to comply with this requirement in G.C.'s situation. However, records show that the Defendants have provided such review for white students in the Defendants.

180. Those suspensions are listed on his school records. Those suspensions and the behavior cited were used as a basis to deny him a FAPE, nonacademic services, physical education, field trips and other school benefits.

181. Defendants rules require a team meeting be held within 10 days to determine whether the disability is a factor in the discipline. The Defendants failed or refused to comply with this requirement in G.C.'s case. However, records show that the Defendants has provided a team meeting within 10 days for white students.

36

182. The Defendants failed or refused to conduct a "manifestation review" in order to determine whether his disability was a factor in the suspension and resulting punishments.

183. The Defendants was required to review the 504 Plan to determine if the Plan was appropriate. The Defendants failed or refused to comply with requirement for G.C. However, records show that the Defendants has reviewed an IEP or 504 Plan for white students in the Defendants.

184. The Defendants has provided the required manifestation reviews for white students in the Defendants.

185. There is no legal justification for denying G.C. the required review in accordance with the law. To allow those suspensions to stand without considering the effect of his disability results in unfairly using his disability against him. This is not done for nondisabled students; they do not have a disability that works against them. This amounts to unlawful discrimination.

186. Removing G.C. from school completely denied him of any education. No accommodations or services were provided to make up for the missed instruction during the suspensions. The Defendants' actions violated Federal, State and Defendants laws and regulations.

## DEFENDANTS' UNLAWFUL ACT OF DENIAL OF A FREE APPROPRIATE PUBLIC EDUCATION (FAPE)

187. Under Section 504, FAPE consist of the provision of regular or special education and related aids and services designed to meet the student's individual educational needs as adequately as the needs of nondisabled students are met.

188. An appropriate education for a student with a disability under the Section 504 regulations consist of education in a regular classrooms, education in regular classes with supplementary services, and/or special education and related services.

189. The law dictates that G.C. cannot be prevented from exercising his right to a free and appropriate public education. The objective is to provide accommodations so that he could have an equal chance to compete in a regular class.

190. The Defendants has a program for students at risk of academic failure. The program includes education and support services addressing individual learning styles, social needs and one or more of the following: Parent-teacher conferences, counseling services by psychologists, Psychological testing, Community agency services, and Remediation programs. These services are available to nondisabled students. However, the Defendants did not make these services available to G.C. whose GPA is within the "academic failure" range and has been so for the past 4 years. The refusal to offer and provide the same services denies him the benefit of receiving an education, with services.

191. However, these very services are provided to nondisabled students and white students in the Defendants.

192. The Defendants repeatedly referred G.C. for "outside" counseling to address his ADHD, and his severe behavioral problems. However, this would be at the Mother's expense, and therefore not free. This is a violation of Federal, State and Defendants laws and regulations.

193. White students do not pay for counseling services when the Defendants has

determined them to be disabled and eligible for services such as an IEP or 504 Plan.

194. The Defendants' refusal to provide G.C. with an IEP, including services to address his disability, amounted to a denial of a FAPE under Section 504.

## DEFENDANTS' REFUSAL TO PLACE G.C. IN THE LEAST RESTRICTIVE ENVIRONMENT (LRE)

195. The Defendants is required to educate G.C. with children who do not have disabilities as much as possible, in accordance with 34 CFR 300.114. G.C. should have only been removed from general education classes to separate classes only if his disability was so severe that education in general education classes with supplementary aids and services would not be satisfactory. This decision is required to be made by a "group" of persons properly comprised. The persons are required to know the student, the meaning of the evaluation data and placement options.

196. The Defendants put G.C. in class where the majority, or more than 90% if not all, of the students exhibited behavioral problems, had IEPs or 504 plans, obtained no higher than a B average, were required to complete daily behavior monitoring slips, and who received a shorten school day.

197. At no time did the Defendants attempt or try other options. Nowhere in any of the documents provided to the Mother does it show that the Defendants even considered other placement options for G.C., except separation from other students and exclusion from academic and nonacademic activities.

## DEFENDANTS' RETALIATION AGAINST THE MOTHER

198. Federal, State and Defendants laws and regulation provide that the Defendants shall not retaliate against the Mother for exercising her rights or rights on

39

behalf of her son, G.C.

199. Since June 2015, Mother has been exercising her right to obtain information, documents, records, and participation in matters concerning her son's education. In the exercise of those rights, the Mother has requested that the Defendants provide documents or allow her to view documents relating to her son's disability and education. The requests were made in writing. The Defendants has acknowledged receipt of the request.

200. The Defendants refused to provide the Mother with documents, information and records concerning her son's disability and education in the Defendants. School personnel have blatantly refused to meet or speak with the Mother concerning their contact with her son.

201. The Defendants unlawfully threatened the Mother with police arrest if she came on to the Crete Monee Middle School property.

202. Crete Monee Middle School Principal Chrisos instructed G.C.'s teachers not to speak with the Mother or communicate with her concerning G.C.'s education or for any matter whatsoever.

203. The Mother made numerous efforts to telephone, email and personally speak with the counselors, teachers and other school personnel concerning G.C.'s education. The Mother was stopped at the school security desk.

204. The Crete Monee Middle School refused to mail notices to the Mother, although it mailed notices to the other parents.

205. Crete Monee Middle School refused to notify the Mother of adverse

40

incidents concerning her son G.C.

206. When the Mother sent the Defendants her request for an impartial due process hearing, the Defendants refused to forward the request to the ISBE.

207. The Defendants refused to grant the Mother a local meeting or hearing concerning the violations complained of this complaint.

208. The Defendants' school psychologist, Ms. Leftakis, told the Mother that she would not discuss G.C. with her and told her to contact her in 6 months.

209. The Mother sought the Crete Monee records of another child so that the child could apply to an elite high school. The school refused to provide the records to the Mother or the School, thereby preventing the child from attending an elite high school in the State of Illinois.

210. Crete Monee Middle School refused to provide 8th grade graduation tickets for another child's graduation in the Defendants. Mother was not able to attend her child's 8th grade graduation.

211. Crete Monee Middle School refused to allow the Mother to observe G.C.'s classroom behavior.

212. The Defendants refused to consider documents related to G.C.'s disability provided by the mother.

213. The Defendants conducted disability team meeting without allowing the Mother to participate or receive knowledge of the determinations or decisions.

214. The Defendants has emails describing the Defendants' harmful and improper discriminate acts against the Mother.

215. The Mother's request was lawful and appropriate. The Mother has expressed this improper action to the Defendants. At this time, the conduct continues.

216. At all relevant times and continuing to this day, the Defendants has refused the Mother's requests. The Defendants' action were intentionally done to prevent the Mother from obtaining information and knowledge about her son's education and to prevent her seeking redress for the Defendants' violations of Federal, State and Local laws, policies, and regulations. Such actions were done by the Defendants with the deliberate intention of discouraging the Mother from seeking the rights, benefits and privileges afforded to her and her son G.C.

217. There is no lawful basis for the Defendants' retaliatory action.

218. The Defendants' action constitutes retaliatory conduct towards the Mother for exercising her lawful rights granted by IDEA and Section 504 and other cited statutes.

## CAUSES OF ACTION

### Count I.  Violation of the Individuals with Disabilities Education Act (IDEA) And the Defendants' Retaliatory Conduct (Against all Defendants)

219. Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein. IDEA covers four main areas: 1. the procedures to be followed when developing a child's IEP; 2. criteria governing the sufficiency of an education provided to a child; 3. mechanisms for review that must be made available when there are objections to the IEP or to other aspects of IDEA proceedings; 4. and the requirement in certain

42

circumstances that States reimburse parents for various expenses.

220. IDEA ensures that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education. A free appropriate public education must include educational instruction specially designed to meet the unique needs of a child with a disability, coupled with any additional services that are required to assist a child with a disability to benefit from that instruction.

221. The numerous procedural violations committed by the Defendants, which are cited above, impeded G.C.'s right to a free appropriate public education, significantly impeded the Mother's opportunity to participate in the decision making process regarding the provision of a free appropriate public education to G.C. and it caused a deprivation of G.C.'s educational rights.

222. Due to the lack notice, the Mother was completely excluded from the process. The procedures were not followed at all.

223. Based on the forgoing paragraphs, G.C. was denied and continues to be denied a free appropriate public education. Based on the foregoing paragraphs, the Mother has been completely denied the opportunity to participate in the decision making process regarding the provision of a free appropriate public education to G.C..

224. The Mother was purposefully, intentionally excluded from all meetings for at least four years, 2012-2015. The Defendants never sent her a notice as required by law, not even a telephone call.

225. Even when the Mother sought any and all information related to G.C.'s

43

school education, the Defendants willfully withheld information from the Mother. Even upon learning of a 504 Plan, the Defendants sent the Mother on a "wild goose chase" to get a copy of the plan to three separate buildings. It was only the with the assistance of Monica Spence did the Mother obtain a copy of the 504 Plan and some related documents. At the time of this writing, the Defendants is still withholding information and requested documents and information concerning G.C.'s education and school records.

226. These procedural violations have caused a great depravation of G.C.'s educational benefits. The facts set forth in the above paragraphs lists numerous instances where G.C. has been denied benefits and services easily available to other students in the Defendants. The depravations were so great that the Defendants falsely excused G.C. from school for the last 7 days as an "excused absence due to illness." This is false.

227. As stated above, the team assembled to make the evaluation or determination did not meet the minimum requirements set for the regulations. The decision is supposed to be made by "a group" not just the school psychologist. In G.C.'s case, it was the school psychologist making the decision and announcing it to the group. This is not in conformity with the law.

228. Sufficiency of the Education/Identification. For G.C., It was woefully inadequate. The Defendants made the determination that he had a disability, and that the disability adversely affected his ability to learn (among other things like think, read, do math, concentrate, focus). The Defendants had clear evidence of his declining

44

grades and increases in his behavior problems, evidence by his many suspensions.
The Defendants recommended counseling. The Defendants excluded him from
receiving an education like other children by placing him in a detention room for
approximately ½ of the school day, alone. If he was not alone, he was with other
children serving detention. This did not just occur for a month, it occurred for the entire
7th grade school year. In sum, there was little or no education. Surely, this "placement"
could not be appropriate or lawful or the FAPE envisioned under the law. His records
reflect that.

229. Mechanisms of Review. Under this criteria, it is envisioned that there be
some means for the Mother to challenge the action taken by the Defendants concerning
the Defendants' duty to provide a FAPE, services, and benefits to G.C., who has a
disability. However, the Defendants has no such mechanism whatsoever. Upon
learning of the action by the Defendants, the Mother sought to object or challenge the
Defendants' action concerning the eligibility determination, evaluation and the
evaluation team, the assessment, the timeliness of the process, review of the
Defendants decisions, monitoring and implementation.

230. The Defendants responded by informing the Mother that she had no right
whatsoever to make any such objection or challenge, which necessitated filing a due
process complaint at the state level. The lack of such a review process by the
Defendants violates the IDEA and Section 504. Based upon the foregoing, the
Defendants violated the IDEA.

231. Based upon the allegations outlined in this Complaint, the Defendants have

45

violated IDEA, and thereby intentionally caused direct harm to the Plaintiffs.

### Count II. Violation of Section 504 of the Rehabilitation Act of 1973 And the Defendants' Retaliatory Conduct (Against all Defendants)

232. Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein. Section 504 of the Rehabilitation Act of 1973 and its implementing regulations prohibit discrimination on the basis of disability by the Defendants because it receives Federal Funding. Section 504 requires that disabled students be provided with a free appropriate public education including education with non-disabled peers to the maximum extent appropriate.

233. Section 504 Requires the Defendants to provide G.C. with appropriate education services designed to meet his individual needs to the same extent as the needs of other students without disabilities are met.

231. An appropriate education for G.C. consists of education in regular classrooms, education in regular classes with supplementary services, and/or special education and related services.

232. The Defendants failed or refused to provide G.C. with any of these services, options or accommodations. Instead, the Defendants chose to isolate him in a "detention room."

233. Furthermore, the Defendants are obligated to provide the following:

    A. Conduct appropriate childfind and initial evaluations
    B. Provide periodic re-evaluations of students with disabilities
    C. Provide eligible students with FAPE through the provision of a Section 504 plan to meet the individual educational needs of eligible students as adequately as the needs of nondisabled students are met
    D. Provide education to students with disabilities in the least restrictive

environment (LRE)

E. Provide established standards and procedures in the identification and evaluation process.

F. Provide students with disabilities equal access to nonacademic and/or extracurricular services

G. Establish and implement a system of procedural safeguards regarding the identification, evaluation, placement, or provision of FAPE to a student

H. Ensure behavior in question is not a manifestation of a student's disability during disciplinary proceedings

234. Any parent can make a referral for a Section 504 evaluation. A 504 evaluation should have been conducted by the Defendants due to the following:

A. G.C. was exhibiting persistent academic, learning, and behavioral problems throughout the relevant time period of 2011 to 2015.

B. The Defendants did not recommend or apply any behavior management approaches for G.C. based upon his disabilities.

C. G.C. was exhibiting behaviors that resulted in 12 to 15 school suspensions each year. The Defendants refused to consider, evaluate or apply any treatments or plans to address his behavioral or academic problems.

D. Against standard educational disability practices, the Defendants refused to find that G.C. was eligible for an IEP plan due to the Defendants' inability to provide staff and funding to provide the needed services for G.C.

235. The Defendants were required to convene a 504 team in accordance with Section 504. Section 504 provides that, "[a] recipient that operates a public elementary or secondary education program or activity shall conduct an evaluation in accordance with the requirements of paragraph (b) of this section of any person who, because of handicap, needs or is believed to need special

47

education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement." 34 CFR Section 104.35(a).

236. The Defendants were aware of the lack of progress by G.C., the increasing severity of the behavior problems, and the ineffectiveness of past attempts to address his problems, and did not convene such a team for the required evaluations during the relevant four years for G.C.. This was an intentional denial of the rights, benefits and privileges that are afforded to G.C. pursuant to Section 504.

237. The Defendants refused, or with gross negligence, to use tests and evaluation materials that met the statutorily required criteria:

A. Have been validated for specific purpose for which they are used and are administered by trained personnel

B. Be tailored to assess specific areas of educational need and not merely those designed to provide a single intelligence quotient

C. Accurately reflect aptitude or achievement or whatever else the tests purport to measure rather than reflect the student's impaired sensory, manual, or speaking skills.

238. The Defendants' failed to obtain the proper consents from the parents for Section 504 evaluations as required by law.

239. If upon receipt of a parental request for an evaluation for 504 the team determines that an evaluation is not required, the Defendants are required to issue the parents a copy of the 504 Parent Rights and indicate a refusal to evaluate. When the Defendants refused to conduct a 504 evaluation, the

48

Defendants did not issue the parents the required 504 Parent Rights and notification of the refusal to conduct such an evaluation.

240. When the Defendants did conduct a 504 evaluation, the Defendants were required by law to collect the following:

     A. Documentation of impairment
     B. Medical Records
     C. Outside private evaluation if applicable
     D. School based evaluation, if applicable
     E. The documented impairment must be determined from either a medical evaluation or a clinically significant score on a nationally standardized assessment tool.
     F. Parent or teacher report of impairment without documentation specified above will not suffice for evidence of impairment.
     G. Documentation of substantial limitation of a major life activity
     H. Parent input form
     I. Observation fo student in school to include response to accommodations and comparison to average functioning peer in the same major life activity
     J. School records, clinic records, attendance, and curriculum-based performance
     K. Data supporting impact of accommodations
     L. For extended time (it is four years for G.C.), documentation must be provided indicating how much extra extended time the student needs in comparison to an average functioning peer in the same class for the same subject

241. The Defendants did not collect the above documentation in violation of Section 504.

242. Section 504 required the Defendants to schedule a 504 Eligibility Determination Meeting. The Defendants failed to do so for the Plaintiffs.

243. Pursuant to Section 504, G.C. is entitled to discrimination protection, disciplinary safeguards and a 504 accommodation plan.

244. The Defendants refused to or with deliberate indifference failed to

49

protect G.C. from discrimination, use disciplinary safeguards and provide an adequate 504 plan, in violation of Section 504.

245. When making an eligibility determination, the Defendants were required to do the following for G.C.:

    A.  Obtain parental consent

    B.  Provide notice to the parent of the evaluation meeting

    C.  Gather all available information

    D.  Examine no-school factors

    E.  Identify the actual physical or mental impairment

    F.  Identify major impacted life activity

    G.  Determine that the identified physical or mental impairment substantially limits a major life activity

    H.  Verify substantial limitation

    I.  Determine eligibility (as put forth in the statute)

246. The Defendants refused or with deliberate intent failed to make a proper eligibility determination.

247. The Defendants refused or with deliberate intent failed to notify G.C.'s teachers of his 504 plan, plan responsibilities and proper implementation of the plan.

248. Section 504 reevaluations are required before any significant change in placement occurs, such as a pattern of serial suspensions, significant changes in delivery of educational accommodations or behavior.

249. Throughout the relevant four year time period, G.C. had significant changes,

50

such as 12 to 15 suspensions per year, theft, damage to school property, physical aggression, pattern of poor unexcused absences and tardiness, inability to interact with peers and a GPA of 1.0.

250. The Defendants did not provide G.C. with an accommodation plan to address the educational impact of his disabilities and the necessary accommodations and services necessary to facilitate access to education and other school activities in the least restrictive environment.

251. In violation of Section 504, the Defendants:

    A. Used a predetermined checklist and checking accommodations or services that were not necessary

    B. Failed to match services and accommodation with G.C.'s needs

    C. Failed to provide copies and an explanation of the Section 504 plan to the Plaintiffs and teachers for implementation

    D. Failed to conduct timely evaluations

    E. Wrote vague plans

    F. Provided no monitoring of the implementation of the plan

252. As outlined in the facts, the Defendants refused or with deliberate indifference failed to provide G.C. with a FAPE.

253. The Defendants did not provide him with educational services in the general education environment to the maximum extent appropriate to his needs. For example, he was placed in a classroom of 20 students. Eighteen of the students were on a behavioral plan which required that their behavior be monitored and documents for

51

every class of the day; it's called "check in check out" program. The 18 students were African American males.

254. G.C. was denied participation in all extracurricular activities. This violated Section 504 requirement that the Defendants must ensure nondiscrimination in the provision of opportunities for students with disabilities to participate in nonacademic and extracurricular activities. This denial of nonacademic/extracurricular continued for all four years.

255. Although G.C. had a GPA that ranged from 1.0 to 1.5, he was never provided any related services. He was not provided with any extended school year instruction, no tutoring, no computer assistance, no therapy, no counseling or referrals. The Defendants were required to provide these services. At no time were these services provided to G.C. by the Defendants.

256. The Defendants did not conduct a Section 504 reevaluation for G.C. to ensure that he was receiving the educational and extracurricular activity that other students were receiving. This constituted a violation of Section 504.

257. The Defendants are required to comply with Section 504 procedural safeguards. The Defendants did not comply with the safeguards during the four year period.

258. The Defendants refused to provide the following safeguards in violation of Section 504 in the four year period:

> A. Public notification of their policies of nondiscrimination, identification of
>
> the person who coordinates compliance and adoption of grievance

52

procedures;

B. No retaliation against any person because of his or her exercise of rights under Section 504

259. Section 504 affords the Plaintiffs the following safeguards and rights:

A. Taking part in and receiving benefits from public education programs without discrimination because of disability

B. Receiving notice of rights under this federal law

C. Receiving notice with respect to identification, evaluation or placement

D. Receiving a FAPE with nondisabled students to the maximum extent appropriate; this includes the right to have the school Defendants make reasonable accommodations to allow an equal opportunity to participate in school and school-related activities

E. Being educated in facilities and receiving services comparable to those provided to nondisabled students

F. Having the right to an appropriate education designed to meet individual educational needs as adequately as the needs of nondisabled students

G. Having evaluation, educational, and placement decisions made based on a variety of information sources and by a group of person, including persons who know the student, the evaluation data, and placement options

H. Having the right to an equal opportunity to participate in nonacademic and extracurricular activities offered by the Defendants

I. Examining all relevant records relating to decisions regarding G.C.'s

identification, evaluation, educational program and placement

J. Requesting an impartial due process hearing related to decisions or actions regarding identification, evaluation, educational program, or placement

K. Filing a local grievance with respect to alleged disability discrimination with the Defendants' designated 504 contact person.

260. In all of the above instances, the Defendants refused to provide the plaintiffs with the above safeguards for the four year period, in direct violation of Section 504. Plaintiffs were denied a local grievance, the Defendants did not have a 504 contact, the Defendants denied the Plaintiffs a due process hearing and the Defendants denied the Plaintiffs all of the above mentioned rights, opportunities or safeguards.

261. Defendants refused to provide the following safeguards in violation of Section 504 in the four year period as outlined in the above facts.

262. Based upon the foregoing, the Defendants violated Section 504 of the Rehabilitation Act. Based upon the allegations outlined in this Complaint, the Defendants have violated Section 504, and thereby intentionally caused direct harm to the Plaintiffs.

### Count III. Violation of Title II, American with Disabilities Act of 1990 And the Defendants' Retaliatory Conduct (Against all Defendants)

263. Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein. Title II of the ADA, the title applicable to public services, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a

54

public entity, or be subjected to discrimination by any such entity."

264. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities [.]" The Defendants' actions constitute discrimination in violation of Title II of the ADA by:

      A. Denying G.C. the following when other students were given the opportunities, benefits or privileges:

      B. Denying him the opportunity to participate in sports activities

      C. Denying him the opportunity to participate in nonacademic activities

      D. Excluding him from all field trips and dances

      E. Denying G.C. with an aid, benefit or service that was not effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to other students

265. The Plaintiffs are aggrieved persons entitled to the remedies, procedures, and rights of Title II of the ADA.

266. As a result of the Defendants' unlawful actions, the Plaintiffs have incurred out-of-pocket losses; experience pain and suffering and emotional distress, and otherwise aggrieved.

267. Based upon the allegations outlined in this Complaint, the Defendants have violated Title II, and thereby intentionally caused direct harm to the Plaintiffs.

### Count IV. Violation of the Illinois School Code and the Illinois School Students Records Act (Against all Defendants)

268. Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein. Based on the foregoing paragraphs, the Defendants violated the Illinois School Code and the Illinois School Records Act.

269. The Illinois School Student Records Act provides: "A parent or any person specifically designated as a representative by a parent shall have the right to inspect and copy all school student permanent and temporary records of the parent's child. A student shall have the right to inspect and copy his or her school student permanent record."

270. Any request for records request must be granted within 15 days of making the request to the school records custodian, designee or the Superintendent of the school Defendants.

271. When the student records contain inaccurate information, the Mother has the right to challenge the accuracy, relevance or propriety of any entry in the school student records, exclusive of academic grades, expulsions or out-of-school suspensions, and to insert in their child's school student record a statement of reasonable length setting forth their position on any disputed information contained in the records.

272. Appeals may be made to the ISBE. Refusal to provide access to public school records is subject to an action for injunctive relief and if the court finds the school to have willfully or negligently violated the law, the school ban be held for damages, litigation costs and reasonable attorneys' fees. Wilful failure to comply with the law can also result in criminal penalties to the persons denying access to student records.

56

273. The Illinois School Code provides that each public school board must provide notices to the parent as to events and issues affecting your child. Illinois School Code, Section 10-28.1. Such reports or records include the following: reports or records which reflect the pupil's academic progress, reports of the pupil's emotional and physical health, notices of school-initiated parent-teacher conference, notices of major school-sponsored events such as open houses, which involve pupil-parent interaction, and copies of the school calendar regarding the child which are furnished by the school Defendants to one parent be furnished by mail to the other parent.

274. Based upon the allegations outlined in this Complaint, the Defendants have violated Illinois School Code and the Illinois School Student Records Act, and thereby intentionally caused direct harm to the Plaintiffs.

### Count V. Violation of Crete-Monee Community School Defendants 201U Special Education Procedures Assuring the Implementation of Comprehensive Programming for Children with Disabilities (Crete Special Education Procedures) (Against all Defendants)

275. Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein. Based on the foregoing paragraphs, the Defendants violated the Crete-Monee Defendants 201-U Special Education Procedures and Rules.

276. Crete Monee lawfully passed the Crete Monee Community School Defendants 201u Special Education Procedures.

277. These procedures set forth the policies, rules and regulations as to how the Defendants will apply and enforce Federal and State laws with respect to special education, specifically IDEA , Section 504, and educational records.

278. The Defendants' rules and regulation grant the Mother the right to prior notices and notice of actions affecting her son's education and the following right to:

a. Participate as a team member of the evaluation team

b. Notification of the team's conclusions within 14 days

c. Submit a statement to be on record concerning her disagreements

d. Written notice within 10 school days of the IEP determination in compliance with the Illinois Administrative Code.

e. The right to notification when her son failed to progress after an appropriate time

f. The right to an independent education evaluation

g. A written notification of the procedural safeguards each year

h. A written notification prior to disciplinary removals

i. The right to and opportunity to present and resolve complaints through the due process and state complaint procedures.

j. Notice of the right to mediation

k. Notice of procedures for children who are subject to placement in an interim alternative educational setting

l. Notice of the requirements for disclosure of evaluation results and recommendations

m. Written notice with 10 days of any Defendants proposal to initiate or change the identification, evaluation, or educational placement of or the provision of free, appropriate public education to her son. If the notice is related to an action proposed by

58

the Defendants, the Defendants is required to give the Mother notification of the required informed written consent.

279. The Defendants are required to provide the Mother with notice containing the following:

    1). A description of the action proposed or refused by the Defendants;

    2). An explanation of why the Defendants proposes or refused to take the action;

    3). A description of any other options that the IEP team considered and the reason why those options were rejected;

    4). A description of each evaluation procedure, assessment, record, or report the Defendants used as a basis for the proposed or refused action;

    5). A description of any other factors that are relevant to the Defendants's proposal or refusal;

    6). A statement that the parents of a child with a disability have protection under the procedural safeguards of the individuals with disabilities education act and their respective implementing regulations, and an indication of the means by which a description of those procedural safeguards may be obtained;

    7). Sources for parents to contact to obtain assistance and understanding of the provisions of IDEA;

280. The Defendants' regulation also grants the Mother the following:

    a. The right to an opportunity to inspect and review all education records with respect to her son;

59

b. The right to participate in meetings with respect to the identification, evaluation, and educational placement of her son;

c. The right to receive 10 days notice of such meetings, to include the proposed date, time, and place for the meeting, who will be in attendance, and the right to invite other individuals who the parent believe have knowledge or special expertise regarding her son.

281. The Defendants is required to take whatever action is necessary and reasonable to facilitate the Mother's understanding of and participation in the meeting.

282. Prior to the only the meeting the Mother attended due to a date and time notice by email, Mother requested that documents which would be considered at the meeting be provided to her prior to the meeting so that she could understand the meeting.

283. The Defendants refused to provide a proper notice and refused to provide copies of the documents to consider at the meeting. This was in direct violation of the Defendants' requirement to provide any documents for the meeting upon the Mother's request.

284. The Defendants refused to obtain the Mother's consent, or even notify of the consent requirements pursuant to its own regulations and IDEA.

285. In direct violations of its own regulations and IDEA, the Defendants refused to submit Mother's request for a due process hearing within the required time frame.

286. The Defendants refused to respond to the Mother's due process complaint within 10 days, as required with the Defendants did not provide the Mother with prior

60

written notice

287. As a result of the Defendants' refusal and intentional violations to comply with its duty pursuant to its own regulations, rules and polices, the Mother has suffered damages including special and general damages. Furthermore, such violations continued for four years, grades 4 through 7 and continues to this day.

288. Based upon the allegations outlined in this Complaint, the Defendants have intentionally violated Crete Monee Procedures cited above, and thereby intentionally caused direct harm to the Plaintiffs.

## Count VI.  Violation of the Mental Health and Developmental Disability Confidentiality Act (Against all Defendants)

289. The foregoing paragraphs are hereby incorporated by reference as if fully set forth herein.  Based on the foregoing paragraphs, the Defendants violated the Mental Health Developmental Disability Confidentiality Act.

290. According to the MHDD Confidentiality Act (740 ILCS 110/4) regarding persons entitled to inspect and copy recipient's record:

§ 4.(a) The following persons shall be entitled, upon request, to inspect and copy a recipient's record or any part thereof:

(1) the parent or guardian of a recipient who is under 12 years of age;

(2) the recipient if he is 12 years of age or older;

(3) the parent or guardian of a recipient who is at least 12 but under 18 years, if the recipient is informed and does not object or if the therapist does not find that there are compelling reasons for denying the access. The parent or guardian

61

who is denied access by either the recipient or the therapist may petition a court for access to the record. Nothing in this paragraph is intended to prohibit the parent or guardian of a recipient who is at least 12 but under 18 years from requesting and receiving the following information: current physical and mental condition, diagnosis, treatment needs, services provided, and services needed, including medication, if any;

(4) the guardian of a recipient who is 18 years or older;

(5) an attorney or guardian ad litem who represents a minor 12 years of age or older in any judicial or administrative proceeding, provided that the court or administrative hearing officer has entered an order granting the attorney this right;

(6) an agent appointed under a recipient's power of attorney for health care or for property, when the power of attorney authorizes the access;

(7) an attorney-in-fact appointed under the Mental Health Treatment Preference Declaration Act; or

(8) any person in whose care and custody the recipient has been placed pursuant to Section 3-811 of the Mental Health and Developmental Disabilities Code.

291. And section 110/5 regarding disclosure; consent: …record and communications may be disclosed to someone other than those persons listed in Section 4 of this Act only with the written consent of those persons who are entitled to inspect and copy a recipient's record pursuant to Section 4 of this Act.

Under Section 110/2 definitions: "Confidential communication" or

62

"communication" means any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient. Communication includes information which indicates that a person is a recipient.

"Record" means any record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient concerning the recipient and the services provided.

292. In Section 110/5 of the Mental Health and Developmental Disabilities Confidentiality Act, it states that records and communications may only be disclosed to someone other than those under Section 110/4 with written consent.

293. Illinois law provides strict protections to mental health and developmental disabilities information, Mental Health and Developmental Disabilities Confidentiality Act, 740 ILCS 110/1 et seq. Under this law, and with limited exceptions, information relating to "mental health or developmental disabilities services" may not be released without the patient's specific written "consent." The definition of what constitutes "mental health services" includes examination, diagnosis, evaluation, treatment, and pharmaceuticals.

294. There is a "therapist" exception that permits a health care provider providing "mental health services" to disclose information without consent to certain persons involved in the care, including a "consulting therapist." Thus information may be shared without consent if the health care provider receiving the information is a "consulting therapist."

63

295. The law has specific requirements as to what constitutes a valid "consent," which are similar to HIPAA's Authorization requirements but require some additional provisions (such as a witness signature). Also, the consent must contain an express calendar expiration date or the requested information may only be released on the day the consent is received. To be valid, the consent must specify "the person or agency" to which disclosure will be made, and "advance consent" is valid only if the information to be released is specified in detail and the duration of the consent is indicated.

296. Illinois law specifically prohibits redisclosures of released information unless the patient has consented to subsequent disclosures. The Illinois law permits persons aggrieved by violation of the law to sue for damages and attorneys' fees, and provides that violation of the law constitutes a criminal misdemeanor.

297. Many providers are uncertain how to handle records that may contain mental health information on a patient. The Illinois Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110/ *et seq.*) is designed to protect the privacy of information relating to mental health care and developmental disability services, and prohibits the disclosure of patient information relating to such services without written consent, unless a statutory exception applies. The Illinois law is more stringent than the HIPAA Privacy Rule in the area of mental health information. Therefore Illinois providers must comply with the state law regarding disclosure of mental health information since HIPAA compliance is insufficient.

298. Mental health information that is protected from disclosure without the written consent of the patient or legal guardian includes the following: diagnosis,

64

treatment, evaluations, physical or mental examinations and rehabilitation. These documents may include notes about services provided and correspondence. Under the law, the term "therapist" includes psychiatrists, physicians, social workers, nurses and mental health counselors.

The written consent to disclosure must include certain elements:

- The reason the record is being disclosed;

- The nature of the material being disclosed;

- Name of the person or agency guaranteed permission to obtain the record;

- The calendar date on which the consent expires, provided that if no date is indicated, information may only be released on the day that the consent form is received by the therapist;

- The right of the patient to inspect and copy the information to be disclosed;

- The consequences of the refusal to consent to the disclosure, if any; and

- The right to revoke the consent at any time.

A blanket patient consent to the disclosure of "unspecified information" is invalid.

299. Medical health records may be disclosed without written consent under limited circumstances which include:

- Disclosure to consulting or supervising therapists;

- Disclosure under statutory exceptions governing certain civil, criminal or administrative hearings, such as when an individual introduces his mental condition or services received as an element in a claim or defense and the court determines that the information is relevant and admissible;

65

- Disclosure at the therapist's discretion in commitment proceedings, to render emergency care when consent cannot be obtained or to protect a patient from harm or to prevent a patient from harming others; and

- Disclosure in peer review and research studies.

300. A therapist's personal notes are absolutely protected from disclosure only if such notes are kept in a location separate from the patient's medical record by the therapist for his/her personal use and are not discussed with any other person, except a supervisor, consulting therapist or attorney. Personal notes are defined under Illinois law as: (1) information disclosed to a therapist by other persons on condition that such information never be disclosed to the recipient of mental health services; (2) information disclosed to a therapist by the patient which would be injurious to that individual's relationships to others; and (3) the therapist's speculations, hunches, reminders and impressions.

301. The Mother requested an Independent Education Evaluation because she disagreed with the most recent IEP and Section 504 determination. Federal law provides that when the parent disagrees with the IEP and 504 determinations, an IEE may be requested. If the Defendants fails to provide an IEE, then the Defendants must file a due process complaint. The Defendants failed to request a due process hearing as required by law.

302. The mother has requested on least 4 occasions for the past 3 months the Defendants provide her son's complete and full educational records for her to view. As of this date, the Defendants has failed or refused to do so in accordance with Federal

and State laws.

303. Such notices were in writing, directed to Monica Spence and Principal Chrisos and Mary Belotti. In numerous instances the Mother repeated the requests verbally.

304. On at least 3 occasions, the Mother has requested a list or documentation of the names, dates and times of the persons or organizations to which the Defendants has released her son's educational records.

305. The Mother provided the Defendants with documentation to be considered during the team meeting which was convened to evaluate her son. The Defendants refused to consider the information or documentation as required by IDEA.

306. The Defendants has refused to provide the documentation that is required. Moreover, the Defendants is required to have parental consent prior to such release. The Defendants did not have the required consent to release such documents. Such documents contained the private information of the Mother.

307. The Defendants refused to provide the Mother with a grievance hearing or impartial hearing or meeting.

308. The Defendants refused to provide the Mother with a verbal or written response to her requests, complaints and response to questions about her son's education.

309. As a direct result of the Defendants action, the Mother's rights pursuant to the above stated laws and privacy were violated.

310. As a result of the Defendants' failure to comply with its duty, the Mother has

67

suffered damages including special and general damages.

311. Based upon the allegations outlined in this Complaint, the Defendants have violated the Mental Health Act cited above, and thereby intentionally caused direct harm to the Plaintiffs.

## Count VII.  Unlawful Racial Discrimination in Violation of Title IX of the Education Amendments of 1970 (Sex Discrimination in Education) (Against all Defendants)

312. Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein. The Mother and her son G.C. are African American. G.C. is a male child.

313. Schools may not retaliate against someone filing a complaint and must keep a victim safe from other retaliatory harassment or behavior. Schools must address complaints of sex discrimination.  As part of this obligation they can issue a no contact directive or make other accommodations to ensure the accused or a third party does not retaliate for any complaint. Additionally, the school may not take adverse action against the complainant-victim for their complaint. Any retaliation can and should be reported in a formal Title IX complaint to the U.S. Department of Education since it is your right to be free from a hostile educational environment.

314. Title IX is a federal civil right that prohibits sex discrimination in education. Title IX protects any person from sex-based discrimination. Female, male, and gender non-conforming students, faculty, and staff are protected from any sex-based discrimination.

315. Every school must have a Title IX Coordinator who manages complaints. The Coordinator's contact information should be publicly accessible on the school's

68

website. If you decide to file a complaint, your school must promptly investigate it regardless of whether you report to the police (though a police investigation may very briefly delay the school's investigation if law enforcement is gathering evidence).

316. The school should use a "preponderance of the evidence" standard to determine the outcome of a complaint, meaning discipline should result if it is more likely than not that discrimination, harassment and/or violence occurred. The final decision should be provided to you and the accused in writing.

317. Based upon the allegations outlined in this Complaint, the Defendants have purposefully violated Title IX, and thereby intentionally causing direct harm to the Plaintiffs.

### Count VIII.  Unlawful Racial Discrimination and Retaliation in Violation of 42 U.S.C. Section 1983 (Against all Defendants)

318. Plaintiffs incorporate each of the foregoing allegations as if fully set forth herein.  Count VIII is a civil action under 42 U.S.C. Section 1983 Seeking damages and injunctive relief against all defendants in their official capacity for committing acts, under color of law, with the intent and for the purpose of depriving Plaintiffs of rights secured under the Constitution and laws of the United States; retaliating against  the Plaintiffs for exercising their constitutionally protected rights, benefits and privileges; and for refusing or neglecting to prevent such deprivations and denials.

319. Section 1983 does not impose a state of mind requirement independent of the underlying basis for liability, but there must be a causal connection between the defendant's actions and the harm that results. In order to hold a local government liable

69

under section 1983, the Supreme Court has interpreted this causation element to require that the harm be the result of action on the part of the government entity that implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, or the result of the entity's custom. Further, the entity's policy or custom must have been the "moving force" behind the alleged deprivation.

IDEA, SECTION 504, TITLE II, TITLE IX,

320. Based upon the foregoing allegations of violations committed by the Defendants, and the harm incurred by the Plaintiffs, The Defendants have violated Section 1983.

FOURTEENTH AMENDMENT VIOLATION

321. The Fourteenth Amendment mandates that no State "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV. The Equal Protection Clause safeguards not merely against such invidious classifications as race, gender and religion, but any arbitrary classification of persons for unfavorable governmental treatment. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. Section 1983, provides that no state shall deny person the equal protection of the laws.

322. In addition to protection against deprivations of *procedural* due process, the Due Process Clause has two *substantive* components--the substantive due process simpliciter, and incorporated substantive due process. In order to state a claim for a

70

violation of the substantive due process simpliciter, the plaintiff must demonstrate that the defendant engaged in conduct that was "arbitrary, or conscience shocking, in a constitutional sense." This form of due process has very limited application, but, in contrast to certain procedural due process claims, the existence of adequate post-deprivation remedies does not bar a substantive due process claim. With respect to incorporated substantive due process, the plaintiff may state a claim by proving a violation of one of the Bill of Rights. The Supreme Court has held that one of the substantive elements of the Due Process Clause protects those rights that are fundamental--rights that are implicit in the concept of ordered liberty, and has, over time, held that virtually all of the Bill of Rights protect such fundamental rights and has likewise held that they apply to the states through the "liberty" interest of the Due Process Clause.

## EQUAL PROTECTION VIOLATION

323. The essence of the Equal Protection Clause is a requirement that absent a rational basis for doing otherwise, the state must treat similarly situated persons alike.

324. In the instant case, there is ample evidence of record that the Defendants discriminated against the Plaintiffs.

325. To state a claim based upon the Equal Protection Clause, a plaintiff must allege that she is a member of a protected class, she was similarly situated to members of an unprotected class, and she was treated differently from the unprotected class. Thus, "[t]o bring a successful claim under 42 U.S.C. § 1983 for a denial of equal protection, plaintiffs must prove the existence of purposeful discrimination. . . .In other

71

words, they must demonstrate that they received different treatment from that received by other individuals similarly situated."

326. The Equal Protection Clause of the 14th amendment of the U.S. Constitution prohibits states from denying any person within its jurisdiction the equal protection of the laws. See U.S. Const. amend. XIV. In other words, the laws of a state must treat an individual in the same manner as others in similar conditions and circumstances. A violation would occur, for example, if a state prohibited an individual from entering into an employment contract because he or she was a member of a particular race. The equal protection clause is not intended to provide "equality" among individuals or classes but only "equal application" of the laws. The result, therefore, of a law is not relevant so long as there is no discrimination in its application. By denying states the ability to discriminate, the equal protection clause of the Constitution is crucial to the protection of civil rights.

327. As a direct and proximate cause of the Defendants' violations of the Federal, State, and Local laws, rules, regulations and policies, the Plaintiffs suffered damages, mental and emotional anguish, and damage to reputation, violation of rights, benefits and privileges, as well as other compensatory damages, in an amount to be determined by a jury and the Court.

LOCAL GOVERNMENT VIOLATION

328. A local government is said to have an unconstitutional policy when it fails to train its employees, and the failure to train amounts to deliberate indifference to an obvious need for such training, and the failure train will likely result in the employee

72

making a wrong decision. An unconstitutional policy may also exist if an isolated action of a government employee is dictated by a "final policymaker," or if the authorized policymaker approves a subordinate's decision and the basis for it. However, a supervisor can only be liable in his individual capacity if he directly participates in causing the harm--relying upon respondeat superior is insufficient. The Supreme Court has rejected the notion that a plaintiff must meet a heightened pleading standard to state a claim against a municipality for an unconstitutional custom or policy.

329. Where the state can feasibly provide a pre-deprivation hearing, it must do so regardless of the post-deprivation remedies available.

330. Based upon the allegations outlined in the above stated paragraphs, the Defendants have purposefully violated Section 1983, and thereby intentionally caused direct harm to the Plaintiffs.

WHEREFORE, the following relief is requested on the behalf of the Plaintiffs:

1. That she receive all required notices in accordance with IDEA and Section 504, Federal and State laws;

2. That she be granted the right to view all educational records, including electronic records, related to my son, G.C., for grades 4, 5,6, and 7th, immediately or hold the Defendants in contempt;

3. That she is reimbursed monetarily for all counseling, tutoring and services provided to G.C. that the Defendants failed or refused to provide;

4. That she is reimbursed monetarily for all education provided to G.C. that the Defendants failed or refused to provide;

5. That the Defendants be ordered to cease and desist from committing violations of IDEA and Section 504 of the Rehabilitation Act, and the School Records Act, Illinois School Code; Enter preliminary and permanent injunctions under the IDEA, ADA and Rehabilitation Act (or any of them), enjoining all Defendants to comply with said statutes and to obey and implement an appropriate IEP.

6. Award compensatory education under the IDEA, ADA and Rehabilitation Act (or any of them), enjoining all Defendants to comply with said statutes and to provide such compensatory education.

6. Declare that the Defendants' actions alleged herein violate the Plaintiffs' Fourteenth Amendment and Equal Protection rights under the laws.

6. That the Defendants is ordered to provide notice to the Mother with respect to all identification, evaluation or placement of her son for grades 4 through 7;

7. That the Defendants be ordered to allow the Mother to examine all relevant records relating to decisions regarding my son's identification, evaluation, educational program and placement;

8. That the Defendants be ordered to timely respond to all requests for explanations and interpretation of my son's records, and provide all documents containing the names, dates and times of the release of G.C.'s educational records, including consent documents.

9. That the Defendants be required to provide the Mother with notices as to events and issues affecting her son, pursuant to the Illinois School Code.

74

10. That the Defendants be required to comply with the Illinois School records Act and the Illinois School Code, correct all educational records, remove all improper documents contained in the educational records, including electronic documents.

11. Award compensatory and punitive damages under the IDEA, ADA and Rehabilitation Act (or any of them), and under 42 U.S.C. 1983, 1985 and 1988, for violation of Plaintiffs' rights.

11. Award costs and attorneys' fees and all costs under the IDEA, ADA and Rehabilitation Act, 42 U.S.C. 1983, and 1988.

12. Entry of a declaratory decision that the Defendants violated the above stated laws

13. Award compensatory and punitive damages for violation of Plaintiffs' rights under state law.

14. For appropriate equitable relief against all Defendants as allowed by the Civil Rights Act of 1871, 42 U.S.C. Section 1983, including the enjoining and permanent restraining of these violations, and direction to Defendants to take such affirmative action as is necessary to ensure that the effects of the unconstitutional and unlawful employment practices are eliminated and do not continue to affect Plaintiff's, for an award of reasonable attorney's fees and their costs on their behalf expended as to such Defendants pursuant to the Civil Rights Act of 1871, 42 U.S.C. Section 1988;

15. That all other remedies be provided as deemed appropriate.

**PLAINTIFFS REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Submitted by:

Vanessa Smith
P.O. Box 7661
Chicago, IL 60680

State of Illinois
County of Cook

## **VERIFICATION**

I, Vanessa Smith, hereby verify, under penalty of perjury, that the facts alleged in the foregoing Complaint are true and correct according to the best of my current information, knowledge and belief.

Vanessa Smith

Subscribed and sworn to before me this ____12TH____day of ____NOVEMBER____ 2015.

My Commission expires:

____10 JULY 2016____

NOTARY PUBLIC

"OFFICIAL SEAL"
DAVID J. KRANICKE
Notary Public, State of Illinois
My Commission Expires July 10, 2016
Commission No. 338762

76

## CERTIFICATE OF SERVICE

I certify that on ___11 - 12 - 2015___ date, a copy of this

Verified Complaint was sent by Certified U.S. Mail to the following:


Courtney Stillman
Attorney for the Defendants
Hauser Izzo, LLC
19730 Governors Highway, Suite 10
Flossmoor, IL 60422

Illinois State Board of Education
James Meeks, Chairman
100 North First Street
Springfield, IL 62777-0001

RECEIVED

AUG 2 4 2015

SPECIAL EDUCATION
SERVICES

## ILLINOIS STATE BOARD OF EDUCATION
## IMPARTIAL DUE PROCESS HEARING

George Cox,

      Student,

                                Case No: 2015-0516

v.

                                Beatriz Diaz-Pollack, Impartial Hearing Officer

Crete Monee Community Unit School Dist. 201U,

      School District.

## ORDER REGARDING DISTRICT'S
## MOTION TO DISMISS FOR LACK OF STANDING

      This matter is before the Hearing Officer on District's Motion to Dismiss for lack of standing ('Motion'). As previously articulated in this Hearing Officer's Order of August 10, 2015, a briefing schedule on this Motion was entered and timely completed by both Parties. Subsequent to further Status Conference calls on this matter, District, at the Hearing Officer's request, also submitted a Second Addendum to its Motion to Dismiss. All briefs and exhibits submitted have been duly considered and the following emerges.

      At issue in District's Motion is whether the student's mother, Vanessa Smith ('Mother'), has the requisite legal authority to bring the instant Due Process Request on behalf of her son, George Cox, III ('Student').

      A thorough review of the documents submitted by both Parties in support of, and opposition to, the Motion, as well as numerous status conference calls on this subject with both Parties appearing, including one status call with the Student's father, George Cox, Jr. ('Father'), participating, establish that issues pertinent to the Student's custody and visitation with Mother and Father are in the jurisdiction of the Circuit Court of Cook County, Domestic Relations Division under Case Number 05D79937. That matter was initiated in 2005 and has continued in litigation at intervals with court dates as recent as July of 2015.

      The District's Motion, relying primarily on court orders Dated July 1, 2009 and August 25, 2009, argues that the Mother, while exercising visitation with the Student on the weekends, does not have legal decision making authority and, thus, lacks standing to bring this Due Process Request. *See July 1, 2009 and August 25, 2009 Orders, Case No. 05D79937.* The July 1, 2009 Order and underlying motion indicate that Father requested, and was granted, temporary custody of the Student and his siblings and an abatement of child support. By the same Order, the court denied visitation to

the Mother and set the matter for further Status. The July 1 Order articulates the award to Father as granting temporary possession of the minor children. The August 25, 2009 Order, in relevant part, strikes a motion previously filed by the Mother requesting joint custody and restates the July 1, 2009 Order with regards to the Father's temporary custody of the minors and abatement of child support. A review of the docket in this matter indicates that no motion was filed to make this arrangement permanent rather than temporary, but neither does there appear to be any Order that substantially alters this arrangement until Mother is granted visitation by the January 3, 2013 Order. *See January 3, 2013 Order, Case No. 05D79937*

Mother responds that she has had custody of her son, and his siblings, since birth and continues to have that custody now, and in support of that assertion relies on the January 3, 2013 Order. In addition, she indicates that her parental rights have not been impaired by court order and that she should be given full decision-making authority in matters relating to the Student's education. Furthermore, she asserts that she currently has a motion pending in the domestic relations matter; however, based on Mother's description of that pending motion, its resolution will not alter the custody arrangement that is at the crux of this analysis.

As previously indicated in this Hearing Officer's Order of August 10, 2015, the definition of parent at issue in applicable federal regulations is as follows:

> (1) Except as provided in paragraph (b)(2) of this section, the biological or adoptive parent, when attempting to act as the parent under this part and when more than one party is qualified under paragraph (a) of this section to act as a parent, must be presumed to be the parent for purposes of this section *unless the biological or adoptive parent does not have legal authority to make educational decisions for the child.*
> (2) If a judicial decree or order identifies a specific person or persons under paragraphs (a)(1) through (4) of this section to act as the "parent" of a child or to make educational decisions on behalf of a child, then such person or persons shall be determined to be the "parent" for purposes of this section. [34 C.F.R. 300.30(b)(1) and (2); *Emphasis added.*]

In Illinois, courts of competent jurisdiction may award either joint custody or sole custody of minor children. [See 750 ILCS 5/602.1]. These custody arrangements determine who may exercise parental power, rights, and responsibilities regarding the minor child. Joint custody does not imply or require equal parenting time, and may not be determinative of whether visitation is found appropriate and instituted for the non-custodial parent. [See 750 ILCS 6/600 et seq.] Joint custody is exercised via the execution and entry of a Joint Parenting Agreement or Joint Parenting Order, which are generally developed by the co-parents or by the court of competent jurisdiction and which delineate how the award of joint custody will be exercised when it is found to be in the best interest of a child. [See 750 ILCS 5/602.1].

In the instant matter, there is no evidence of the existence of a Joint Parenting Agreement or Joint Parenting Order, and neither parent has expressed a belief that such a document exists. Rather, the domestic relations court docket and relevant records indicate that since 2009 Mother has initiated requests for joint custody within that matter, but those requests have not been taken to hearing and,

other than visitation, no substantive modifications have been made to the Father's custodial status since the above-referenced 2009 orders. These orders are somewhat inconsistent in the language they apply to the parenting arrangement at issue here, referring to physical possession and custody seemingly interchangeably, and never expressly outlining the scope of each parent's decision-making authority vis-à-vis each other. Furthermore, they are, at times, inconsistent in terms of the requests made of the Court and the language of the Court's Orders, such as where visitation is requested and visitation/custody is awarded without further clarification as to whether that custody is intended to the required parameters of cooperation between the parents, especially in the absence of a joint parenting agreement or order.

What is clear, and both Parties agree on, is that as of the latest relevant order, the Student resides with his father, in the District from Monday through Friday of each week, and has visitation with his Mother, at her home outside of the District, Friday at 2:30 pm to Monday at 9:00 a.m. *See January 3, 2013 Order, Case No. 05D79937.* Thus, at all times relevant to his school attendance, the Student's Father has legal authority to make decisions related to the Student, while the Mother's visitation and custody, or legal authority, are limited to times when the Student is not in attendance at school. While this arrangement does nothing to abrogate the right of the Mother to seek and be granted access to Student's educational records, it is the only current document in the domestic relations case file that provides any clear delineation of when each parent is to exercise custody – or decision-making authority – over the Student. Thus, it is the determination of this Hearing Officer that, based on the current custodial relationship between the parents and child in this matter and in the absence of any further order of the domestic relations court clarifying its expectations with regards to the exercise of legal decision-making authority in this matter, the Mother lacks educational decision-making authority relative to the Student and does not have standing to pursue this Special Education Due Process Request.

Based on the foregoing, IT IS HEREBY ORDERED:

1.     District's Motion to Dismiss for lack of standing is granted;

2.     This matter is dismissed.

### Notice of Right to Request Clarification

Pursuant to 105 ILSC 5/14-8.02a(h) either party may request clarification of this decision by submitting a written request to the Hearing Officer within five (5) days of receipt of the decision. The request for clarification shall specify the portions of the decision for which clarification is sought. A copy of the request shall be mailed to all other parties and the Illinois State Board of Education, Program Compliance Division, 100 North First Street, Springfield, IL 62777. The right to request clarification does not permit a party to request reconsideration of the decision itself and the Hearing Officer is not authorized to entertain a request for reconsideration.

## Notice of Right to Appeal

This is the final administrative decision in this matter. Pursuant to 105 ILCS 5/14-8.02a(i), any party aggrieved by this Hearing Officer Determination may bring a civil action in any state court of competent jurisdiction or in a District Court of the United States without regard to the amount in controversy within one hundred and twenty (120) days from the date the decision is mailed to the party.

IT IS SO ORDERED.

Dated: August 24, 2015

/s/ Beatriz Diaz-Pollack

Beatriz A. Diaz-Pollack, Hearing Officer

PO Box 5443
Elgin, Illinois 60121
(847) 767-6757
badiazpollack@gmail.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the Order
Regarding District's Motion to Dismiss for Lack of Standing were sent via electronic mail to:

Parent – Vanessa Smith
*Electronic Mail: vanessachicago@yahoo.com*

and

Counsel for District – Courtney Stillman
*Electronic Mail: CStillman@hauserizzo.com*

On August 24, 2015

*/s/ Beatriz Diaz-Pollack*
Beatriz A. Diaz-Pollack, Hearing Officer

PO Box 5908
Elgin, Illinois 60121
(847) 767-6757
badiazpollack@gmail.com

**SCHONEWEIS WANDA**

| | |
|---|---|
| **From:** | Beatriz Diaz-Pollack [badiazpollack@gmail.com] |
| **Sent:** | Monday, August 24, 2015 3:41 PM |
| **To:** | vanessachicago; Courtney Stillman |
| **Cc:** | EULASS ANDREW; SCHONEWEIS WANDA |
| **Subject:** | GC v. Crete Monee CUSD 201u - ISBE Case No. 2015-0516 - ORDER |
| **Attachments:** | GCvCUSD201u_Order 8.24.15.pdf |

Dear Parties -

Attached please find the Order regarding District's Motion to Dismiss for lack of standing.

The Motion is granted and, accordingly, the due process request is dismissed. Thus, no further status date is set.

Sincerely,
Beatriz Diaz-Pollack


**Beatriz A. Diaz-Pollack, Esq.**
*badiazpollack@gmail.com*

P.O. Box 5443
Elgin, Illinois 60121


*Consistent with the Electronic Communications Privacy Act (18 USC 2510 et seq), This email may contain material that is confidential, privileged and/or attorney work product for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.*

1